IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


WENDELL ARDEN GRISSOM,      )
                                 )
        Petitioner,          )
                                 )
vs.                             )    Case No. CIV-11-1456-R
                                 )
KEVIN DUCKWORTH, Interim Warden,  )
     Oklahoma State Penitentiary,     )
                                 )
        Respondent.[1]     )
                                 )


## MEMORANDUM OPINION

Petitioner, Wendell Arden Grissom, a state court prisoner, has filed a Petition for Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 20. Petitioner, who is represented by counsel, is challenging the convictions entered against him in Blaine County District Court Case No. CF-2005-80. Tried by a jury in 2008, Petitioner was found guilty of four crimes: murder in the first degree (Count 1), shooting with intent to kill (Count 2), grand larceny (Count 3),[2] and possessing a firearm after a felony conviction (Count 4). Petitioner was sentenced to death for the murder, and for his non-capital crimes, he received a consecutive sentence of life plus sixty-five years. The jury

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kevin Duckworth, who currently serves as interim warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party Respondent.

[2] On direct appeal, the OCCA modified this conviction to larceny of a motor vehicle. See Ground Ten, infra.

found three aggravating circumstances in support of Petitioner's death sentence: (1) Petitioner knowingly created a great risk of death to more than one person; (2) Petitioner committed the murder while serving a sentence of imprisonment on conviction of a felony; and (3) the existence of a probability that Petitioner will commit criminal acts of violence that would constitute a continuing threat to society (O.R. V, 651, 673-74, 757-59; S. Tr. 2-3).

Petitioner has presented eleven grounds for relief. Respondent has responded to the petition and Petitioner has replied. Docs. 43 and 58. In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 21 and 47. After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth herein, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. Grissom v. State, 253 P.3d 969 (Okla. Crim. App. 2011), cert. denied, 132 S. Ct. 825 (2011). Petitioner was denied post-conviction relief. Grissom v. State, No. PCD-2008-928 (Okla. Crim. App. 2011) (unpublished).

## II. Facts.

Pursuant to 28 U.S.C. § 2254(e)(1), factual determinations made by the OCCA are presumed correct in this proceeding. From the evidence presented at trial, the OCCA determined the following facts:

On November 2, 2005, [Petitioner] left Arkansas and headed west on Interstate 40, driving his white Chevrolet truck. Just across the Oklahoma state line, he picked up a homeless hitchhiker, Jessie Johns. As they continued west, the two men drank whiskey and got acquainted. They also discussed plans to commit some robberies or burglaries to raise money. Later that evening, [Petitioner] checked into a hotel in Oklahoma City, paying $266.00 for a weekly rental. [Petitioner] shared his room that evening with Jessie Johns, who slept on the floor.

The following morning, Jessie Johns watched as [Petitioner] showed him how to load a .44 caliber black powder pistol, one of two firearms in [Petitioner's] possession at the time. The other was a two-shot .22 caliber derringer. The two men drank more alcohol that morning as they again headed west in [Petitioner's] truck on Interstate 40. They stopped around 10:45 a.m. at the Love's Country Store on Exit 108, where security cameras recorded each man buying a pair of brown cotton gloves. They then drove into rural Blaine County, looking for a house to burglarize.

[Petitioner] ultimately parked his truck in the driveway of the residence of Matt and Dreu Kopf, near Hitchcock, in rural Blaine County. He told Jessie Johns to wait until the shooting was over and then come in and help him burglarize the house. [Petitioner] approached a sliding door at the rear of the residence and knocked. Dreu Kopf was inside her home that morning with her best friend, Amber Matthews, and her two young children, eighteen month-old Rylie and infant Gracie Jo. Rylie was in her crib in the bedroom and Ms. Kopf was holding Gracie. Ms. Matthews answered the sliding glass door as Ms. Kopf turned in her glider chair to speak with [Petitioner]. He asked Ms. Kopf if her husband was home. She replied that her husband was at work. [Petitioner] told her he would come back later. Ms. Matthews closed the door, but seconds later [Petitioner] reappeared. Ms. Kopf handed the baby to Ms. Matthews and approached the door again. [Petitioner] shot a pistol round into the large glass pane and shattered it. He then stepped into the residence and fired a second shot at Ms. Kopf, striking her in the hand.

Amber Matthews ran with the baby into Rylie's bedroom. Ms. Kopf fought with the intruder and pushed him across the room onto a couch. While Ms. Kopf was on top of [Petitioner] fighting him, she begged him to take what he wanted and leave. He just laughed at her as he pulled the black powder pistol from his waist and put it to her head. She grabbed at the weapon as he fired it, but a bullet tore through her hand and struck the side of her head, fracturing her skull. [Petitioner] then stuck the big pistol in her hip and fired again. The force of this shot threw Ms. Kopf onto the floor.

[Petitioner] got up and headed toward the bedroom where the children and Ms. Matthews were. Ms. Kopf then heard Ms. Matthews beg for her life, and the report from [Petitioner's] pistol. Ms. Kopf escaped from the house to her garage and activated the overhead door. Realizing that she was leaving a blood trail for her killer to follow, she knew she could not hide. She saw the white truck in her driveway pointed toward the road for a getaway, and ran toward it.

Jessie Johns had left the truck and approached the residence after hearing several shots. He saw Ms. Kopf run from the house. He stepped through the shattered door and found [Petitioner] standing over a wounded Amber Matthews. He watched as [Petitioner] fired another shot into Ms. Matthews with the .44. Johns then told [Petitioner] that someone had run from the house. [Petitioner] ran toward the truck, tried to get inside, and fired his .44 pistol again at Ms. Kopf as she pulled away. Not far from her house, Dreu Kopf flagged down a trio of truckers hauling rock and told them that her friend and children were dead and she had been shot. One of the truck drivers, himself a retired police officer, got into the truck with Ms. Kopf. He reported the shooting by phone to the Kingfisher County Sheriff's Office and drove Ms. Kopf to the hospital in nearby Watonga.

Realizing their plans were foiled, [Petitioner] and Johns attempted their escape from the crime scene on a red four-wheeler ATV they found in the Kopf's garage. A postal delivery man saw two men on the red four-wheeler leaving the Kopf residence with a black dog chasing them. The rock haulers, who had encountered Dreu Kopf only a few minutes earlier, saw two men speed past them on a red four-wheeler. The men on the four-wheeler ran out of gas after a short distance, but managed to hitch a ride with a passing farmer, who assumed they were laborers. He gave them a ride to the Hillstop Cafe, just over the Kingfisher County line on Highway 33.

The two women who were running the Hillstop Cafe that day became frightened when they noticed a pair of men looking in the windows of the store from outside and looking inside cars parked at the Hillstop. The two men then came in the store. Each bought an individual can of beer. One of the men, later identified as Jessie Johns, walked across the highway, ducked into some trees, and sat there drinking his beer. The other man headed across a wheat field on foot. Johns later walked back across the street and purchased a second can of beer. After he left the store the second time, one of the clerks called the Kingfisher County Sheriff's Office and reported two suspicious men hanging around the store. The clerks also

asked the only customer in the store, a local man waiting on his lunch, to stay with them until the two strangers were gone.

Recognizing the possible connection to the report of a shooting at the nearby Kopf residence about thirty minutes earlier, Kingfisher County Sheriffs officers now raced toward the Hillstop Cafe. Not far away, emergency personnel and various officers of the Watonga Police Department, the Blaine County [ ] Sheriffs Office, and the Oklahoma Highway Patrol descended on the Kopf residence after the initial report of a shooting. Officers approached the home cautiously, but managed to enter and find the Kopf children alive. Amber Matthews was unconscious and mortally wounded. She died during a medical evacuation flight to an Oklahoma City hospital.

Back at the Hillstop Cafe, a Kingfisher County deputy sheriff approached Jessie Johns, who was now walking down the road, and detained him for investigation. The deputy questioned Johns briefly, searched him for weapons, and drove him back to the Hillstop Cafe. Meanwhile, law enforcement officers continued to gather information about the crimes at the Kopf residence and the suspicious persons reported at the Hillstop. About forty-five minutes after being detained, police arrested Jessie Johns for involvement in the four-wheeler theft and other crimes at the Kopf residence.

Investigators eventually located [Petitioner] hiding in a rock pile near the Hillstop Cafe. They recovered a blood-stained .22 pistol and a pair of brown cotton gloves from his person. They ultimately recovered [Petitioner's] .44 pistol and a second pair of brown cotton gloves discarded near the crime scene. The State also presented evidence that a DNA profile isolated from blood stains on [Petitioner's] jeans matched to a DNA profile from the known blood of Dreu Kopf. [Petitioner] did not testify at trial, but the State presented a videotape of his statement to police. On appeal, [Petitioner] describes these crimes as "a tragedy with no discernible cause," admitting that he shot Amber Matthews and Dreu Kopf "for reasons even he does not understand."

Grissom, 253 P.3d at 973-75.

Pursuant to Section 2254(e)(1), Petitioner can rebut the presumed correctness of these facts by presenting clear and convincing evidence that they are incorrect. Although Petitioner has included his own statement of the facts in the petition, it is not a summary

of the evidence presented at trial, but his version of the truth. Because Petitioner blends the basic facts of his crimes with enhancements and embellishments based largely on information developed after trial, and because his statement of the facts contains absolutely no supporting citations to the state court record (or even to his own exhibits upon which he heavily relies), Petitioner fails to show by clear and convincing evidence that the OCCA's determination of the facts is incorrect.

### III. Standard of Review.

**A.     Exhaustion as a Preliminary Consideration.**

The exhaustion doctrine, a matter of comity which has long been a part of habeas corpus jurisprudence, requires the Court to consider in the first instance whether Petitioner has presented his grounds for relief to the OCCA. As the Supreme Court stated in <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." The exhaustion doctrine is set forth in 28 U.S.C. § 2254(b). Section 2254(b)(1)(A) prohibits the Court from granting habeas relief in the absence of exhaustion (although Section 2254(b)(1)(B) sets forth two limited exceptions to this rule), but Section 2254(b)(2) expressly authorizes the Court to deny habeas relief "notwithstanding the failure of [Petitioner] to exhaust the remedies available in the courts of the State."

**B.     Procedural Bar.**

Beyond the issue of exhaustion, the Court must also examine how the OCCA adjudicated each of Petitioner's grounds for relief, i.e., whether the OCCA addressed the

merits of Petitioner's grounds or declined to consider them based on a state procedural rule. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

### C.    Limited Merits Review.

When the OCCA has addressed the merits of one of Petitioner's grounds for relief, the Court reviews that ground in accordance with the standard of relief set forth in 28 U.S.C. § 2254(d). Pursuant to that section of the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order for Petitioner to obtain relief, he must show that the OCCA's adjudication of his claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that "[t]he petitioner carries the burden of proof"). The very focus of this statutory provision is the reasonableness of the OCCA's decision. "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was

unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). In other words, "[i]t is not enough that [the Court], in its independent review of the legal question, is left with a firm conviction that the [OCCA] was erroneous." What is required is a showing that the OCCA's decision is "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted).

The Supreme Court has repeatedly acknowledged that Section 2254(d) "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court[,]'" and that "[i]f [it] is difficult to meet, that is because it was meant to be." White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. ___, 134 S. Ct. 10, 16 (2013)); Harrington v. Richter, 562 U.S. 86, 102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102. What remains, then, is a very narrow avenue for relief, one that permits relief only "*where there is no possibility* fairminded jurists could disagree that the [OCCA's] decision conflicts with [the Supreme] Court's precedents." Id. (emphasis added).

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 102-03 (citation omitted).

# IV. Analysis.

## A.     Ground One:          Ineffective Assistance of Trial and Appellate Counsel.

In his first ground for relief, Petitioner presents four claims of trial and appellate counsel ineffectiveness. Petitioner's first claim is that his trial counsel were ineffective with respect to the investigation and presentation of mitigating evidence. In his second and third claims, Petitioner additionally faults his trial counsel for failing to request certain jury instructions and for failing to object to the prosecutor's second stage closing argument. Petitioner's final claim is a charge against his appellate counsel for failing to raise certain issues on direct appeal.

### 1.     The Applicable Supreme Court Law.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." Titlow, 134 S. Ct. at 18. Whether counsel has provided constitutional assistance is a question to be reviewed under the familiar standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief, a petitioner is required to show not only that his counsel performed deficiently, but that he was prejudiced by it. Strickland, 466 U.S. at 687. The assessment of counsel's conduct is "highly deferential," and a petitioner must overcome the strong presumption that counsel's actions constituted sound trial strategy. Id. at 689. A showing of prejudice under Strickland "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In <u>Richter</u>, discussed above, the Supreme Court not only addressed the narrow confines of AEDPA review and relief, but it also showed how AEDPA specifically applies to a claim of ineffective assistance of counsel that a state court has denied on the merits. The <u>Richter</u> Court acknowledged that even under de novo review, "'[s]urmounting <u>Strickland's</u> high bar is never an easy task.'" <u>Richter</u>, 562 U.S. at 105 (quoting <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010)). However, "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult." <u>Id.</u>

> The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.] The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard.

<u>Id.</u> (internal quotation marks and citations omitted).

## 2. Trial Counsel and the Mitigation Case.

Petitioner's mitigation claim includes the claim he raised on direct appeal and the four claims he presented in his post-conviction application, plus additional "enhanced" evidence discovered by habeas counsel in their preparation of the petition. For the reasons set forth below, the Court finds that the OCCA did not unreasonably deny Petitioner relief on direct appeal. Therefore, the Court is precluded from considering Petitioner's additional evidence, evidence which was not before the OCCA when it decided Petitioner's claim. <u>Pinholster</u>, 563 U.S. at 181 ("review under § 2254(d)(1) is

limited to the record that was before the state court that adjudicated the claim on the merits").[3]   The Court additionally finds that Petitioner's post-conviction claims are procedurally barred from review.

## The Claim Raised on Direct Appeal

In their eleventh proposition of error, appellate counsel argued that trial counsel were ineffective for failing to adequately investigate and present additional mitigation evidence. *Brief of Appellant* at 63-69.  Appellate counsel claimed that "[w]hile offering some insight into [Petitioner's] life and character, the mitigation evidence did not tell as compelling a story as it could have had the defense team followed the lead of the evidence." Id. at 65-66.  The evidence that appellate counsel faulted trial counsel for not presenting was evidence that Petitioner had dementia.

The record reflects that while Petitioner's case was on appeal, appellate counsel retained the services of Antoinette McGarrahan, Ph.D., a clinical forensic psychologist who specializes in neuropsychology.  Appellate counsel tasked Dr. McGarrahan "to determine whether [Petitioner] suffer[ed] from any cognitive deficiencies and/or brain damage." Id. at 66.   Then, utilizing the OCCA's Rule 3.11, appellate counsel

---

[3] Although Petitioner acknowledges that the Court cannot consider his additional evidence unless it first concludes that the OCCA rendered an unreasonable decision, he argues in the alternative that his case should be held in abeyance while he returns to state court to file a second post-conviction application including his new evidence.  Petition, pp. 29-31.  Having concluded that Petitioner has failed to show that the OCCA acted unreasonably based on the record before it at the time it rendered its decision on Petitioner's claim, there is simply no point in delaying the present action while Petitioner seeks to present his new evidence to the OCCA.  Irrespective of how the OCCA would treat Petitioner's new evidence, the Court cannot consider it when reviewing the reasonableness of the OCCA's 2011 decision.  Pinholster, 563 U.S. at 182-83 ("It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.").

supplemented the claim raised in their brief by filing an Application for an Evidentiary Hearing on Sixth Amendment Claims (hereinafter "*Rule 3.11 Application*") containing documents from Dr. McGarrahan, including an affidavit summarizing her findings (Exhibit 1), her curriculum vitae (Exhibit 1-A), and her complete Neuropsychological Evaluation Report (Exhibit 1-B).

Dr. McGarrahan found that Petitioner had "significant cognitive dysfunction involving memory and planning, reasoning, and organization abilities as a result of permanent organic brain damage effects of his repeated head injuries in combination with his severe alcoholism." *Rule 3.11 Application* at Exhibit 1. She concluded that these "cognitive difficulties [met] the . . . criteria for Dementia Due to Multiple Etiologies." Id. It was Dr. McGarrahan's opinion that Petitioner had this condition at the time the crimes were committed and that it "likely impaired his ability to function in a cognitively efficient manner." Id.

In denying Petitioner's claim, the OCCA applied Strickland, giving due consideration to the evidence presented at trial, Dr. McGarrahan's opinion, and the arguments of appellate counsel. Grissom, 253 P.3d at 993-96. The OCCA reasoned as follows:

> The neuropsychological report largely reflects the mitigating narrative already presented at trial. Other aspects of the report are equivocal, at best: The mitigating force of [Petitioner's] reported deficits in memory, planning, and organizational skills—as a result of his alleged dementia—is significantly diminished by other undisputed evidence of how he carried out these crimes. To borrow a phrase from his expert, if [Petitioner] had been slightly more "cognitively efficient" in the execution of his plans, he certainly would have murdered Dreu Kopf, and might have avoided apprehension altogether, or at least long enough to endanger additional

lives. The proffered evidence of [Petitioner's] diagnosis with dementia and its accompanying deficits does not appreciably alter the balance of aggravating and mitigating circumstances considered by the jury at trial. We conclude that [Petitioner] has not shown that counsel was ineffective for failing to utilize the type of evidence presented in his supplemental materials, and no evidentiary hearing is necessary.

Id. at 995-96. Petitioner presents three challenges to this decision.

The first is a challenge to the OCCA's application of its own Rule 3.11 to the determination of his claim. Petitioner contends that the OCCA applies the rule in a manner that is inconsistent with Strickland. In denying Petitioner relief, the OCCA specifically referenced its decision in Simpson v. State, 230 P.3d 888, 906 (Okla. Crim. App. 2010), wherein it explained the relationship between the Strickland standard and the Rule 3.11 standard a defendant must meet in order to obtain an evidentiary hearing in state court on his ineffectiveness claim. Grissom, 253 P.3d at 995. Calling the OCCA's explanation both dubious and unconvincing, the bottom line is that Petitioner simply does not believe what the OCCA has said about the operation of Rule 3.11. Petition, p. 11 n.6. Despite Petitioner's disbelief, however, the Tenth Circuit's decision in Lott v. Trammell, 705 F.3d 1167 (10th Cir. 2013), is determinative of the issue. In Lott, the Tenth Circuit acknowledged the Simpson decision, reversed the position it took in Wilson v. Workman, 577 F.3d 1284 (10th Cir. 2009) (en banc), and concluded that when the OCCA applies Rule 3.11 to deny a defendant an evidentiary hearing, the same constitutes a merits ruling entitled to AEDPA deference. Lott, 705 F.3d at 1211-13. See Glossip v. Trammell, 530 F. App'x 708, 736 (10th Cir. 2013) (acknowledging that Wilson is "no longer good law given the OCCA's subsequent decision in Simpson").

> The OCCA's decision in <u>Simpson</u> . . . clarifies that the interplay of Rule 3.11's "clear and convincing" evidentiary standard and its "strong possibility of ineffectiveness" substantive standard is "intended to be less demanding than the test imposed by <u>Strickland</u>." 230 P.3d at 906. In other words, the OCCA in <u>Simpson</u> has now assured us that "when [it] review[s] and den[ies] a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, [it] necessarily make[s] the adjudication that [a defendant] has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in <u>Strickland</u>." <u>Id.</u> Consequently, it is plain to us, as a matter of federal law, that any denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11 . . . operates as an adjudication on the merits of the <u>Strickland</u> claim and is therefore entitled to deference under § 2254(d)(1).

<u>Lott</u>, 705 F.3d at 1213. Thus, in accordance with <u>Lott</u>, Petitioner's Rule 3.11 challenge lacks merit and the OCCA's denial of Petitioner's direct appeal mitigation claim is entitled to AEDPA deference.

Second, Petitioner challenges the OCCA's factual finding that Dr. McGarrahan's "report largely reflects the mitigating narrative already presented at trial." <u>Grissom</u>, 253 P.3d at 995. Although Petitioner acknowledges that his trial counsel presented two mental health professionals in mitigation (Dr. Terese Hall, a psychologist, and Dr. Michael Dunn, a psychiatrist), Petitioner argues that, unlike Dr. McGarrahan, neither were qualified to detect his brain dysfunction. Because Dr. McGarrahan's "entire focus was the brain" and because she found "specific organic problems with [his] brain[,]" Petitioner contends that, contrary to what the OCCA found, her findings were "something else entirely from the narrative that was presented." Petition, pp. 11-12.

Petitioner does not and cannot dispute the fact that his life history, from his birth in 1968 to the time these crimes were committed in 2005, was known by trial counsel and

detailed for the jury at trial by the presented experts. See Grissom, 253 P.3d at 995 (noting the "extensive testimony" regarding Petitioner's history). See also Response, pp. 15-17 (setting forth the mitigation case presented). Petitioner does not assert that trial counsel missed any of his life and/or mental health history, but instead claims that in light of everything trial counsel knew, they should have retained a third and more qualified expert, like Dr. McGarrahan, to evaluate him for brain damage. It therefore follows that the very posture of Petitioner's claim belies his factual challenge to the OCCA's decision. Comparing the reports and testimony of Drs. Hall and Dunn, the testimony provided by Petitioner's parents and a longtime friend, and all of the evidence introduced by trial counsel in the second stage to the information presented in Dr. McGarrahan's report, it is, as the OCCA found, "largely" the same narrative. Grissom, 253 P.3d at 995. The only difference, as Petitioner himself acknowledges, is the dementia diagnosis arrived at by Dr. McGarrahan, a difference the OCCA noted as well.

> The record also reflects that [Petitioner] retained a forensic psychologist and a forensic psychiatrist to testify in his defense at trial. These expert witnesses evaluated [Petitioner] and gave extensive testimony of their findings, including [Petitioner's] reported history of a difficult birth, academic and social problems at an early age; a history of head trauma; his criminal history and imprisonment; abuse of alcohol; depression; and his troubled marriage. Neither of [Petitioner's] expert witnesses at trial expressly diagnosed [Petitioner] as suffering from dementia at the time of these offenses.

Grissom, 253 P.3d at 994-95. Finding only one difference from what Petitioner presented on direct appeal to what trial counsel presented at trial, the OCCA's finding that the two were "largely" the same is not unreasonable, and consequently, Petitioner's second challenge to the OCCA's decision fails.

Petitioner's third challenge to the reasonableness of the OCCA's decision attacks the very core of the OCCA's denial–its assessment of Dr. McGarrahan's findings as "equivocal." Grissom, 253 P.3d at 995. Petitioner faults the OCCA for inexcusably failing to appreciate the significance of Dr. McGarrahan's diagnosis.[4] The question the Court must answer is whether the OCCA acted unreasonably when it determined that trial counsel were not ineffective for failing to discover that Petitioner suffers from dementia and that Petitioner's dementia diagnosis did "not appreciably alter the balance of aggravating and mitigating circumstances considered by the jury at trial." Grissom, 253 P.3d at 995. For the following reasons, the Court concludes that it did not.

Petitioner's argument regarding the general mitigating effect of brain damage evidence is sound and supported. See Wilson v. Trammell, 706 F.3d 1286, 1310 (10th Cir. 2013) (acknowledging that "organic brain damage [is a] well-recognized ground[] for mitigation"); Hooks v. Workman, 689 F.3d 1148, 1205 (10th Cir. 2012) ("Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect."). Petitioner states that "deficits

_____

[4] Although habeas counsel stops just short of calling all of the OCCA judges incompetent, they state that the OCCA judges "do not understand how critical neuropsychological impairments are[,]" that they were "**flat wrong**," and that they are "a panel of experienced and burdened appellate jurists dispassionately unmoved by what they wrongly perceived to be 'dubious' evidence." Petition, p. 13. In the reply, habeas counsel continue their tirade against the OCCA and sling mud at Respondent as well. Emphasizing once again that the OCCA was flat wrong, they belittle the OCCA's decision as an "unsupported foray into brain science evaluation." Reply, p. 2. As for Respondent, they say that she (referring to the then serving Warden Anita Trammell) "is not even an amateur scientist, and has no scientific or evidentiary support for her ***un***-expert opinion." Id. While it is clear that habeas counsel is passionate about Petitioner's cause, berating the OCCA and the opposing party does absolutely nothing to advance their legal argument.

in neuropsychological functioning go to explain the crime and reasons why [a defendant] should not be executed." Petition, p. 8. Among other things, it can explain to the jury whether a defendant has the "ability to inhibit unsuccessful behavior" and/or the "ability to appreciate consequences and risks to his behavior." Id. at n.5. Petitioner notes that it is also the type of evidence which can garner jury sympathy. Id. at 14. With respect to his case in particular, Petitioner asserts that if his jurors had been told that his "brain was flawed" and that his "behavior was a product of a flawed brain[,]" they would have been able "to completely understand [him] as a person." Id. Petitioner contends that if the jurors had been told of Dr. McGarrahan's diagnosis, they would have been "given a sense of security that comes with an answer to the question of why it happened." Id.

While there is no doubt that evidence of organic brain damage can provide a compelling mitigation case, it is equally clear that its strength and persuasiveness is dependent upon showing that it contributed to a defendant's criminal actions. Some of the cases cited by Petitioner in support of his claim illustrate this very point.

In Hooks, 689 F.3d at 1203, the Tenth Circuit found that trial counsel was ineffective in the second stage in part because "the mental-health evidence presented was inadequate and quite unsympathetic." Although some mental health evidence had been presented, it was of little value because it failed to connect the defendant's mental problems to the circumstances of the crime. Id. at 1204.

> The importance of counsel's role in this regard cannot be overstated, as we have repeatedly recognized. Counsel in capital cases must explain to the jury why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and, on the other, his commission of

the crime in question.  Here . . . the jury was left with almost no explanation of how Mr. Hooks's mental problems played into the murder . . . .

Id. (citations omitted).

In Anderson v. Sirmons, 476 F.3d 1131, 1143-48 (10th Cir. 2007), trial counsel did not have the defendant evaluated by a mental health expert and therefore failed to discover that he had brain damage which affected "his reasoning, problem solving, and judgment."  The Tenth Circuit found that this evidence could have "offer[ed] the jury a potential explanation for [his] actions relating to the murders he participated in."  Id. at 1144.  It "could have both explained to the jury the reasons [the defendant] was predisposed to act in concert with [his co-defendants] on the night of the murders and demonstrated [he] was less morally culpable than the average defendant for committing the murders."  Id. at 1147.  Because the defendant "had no history of criminal violence prior to the murders in question" and because "his family considered him a loving man, who always cared for his family and children and worked hard to support them[,]" the Court found that evidence of his mental difficulties could have been utilized by trial counsel to "humanize [the] defendant and explain why an otherwise kind and loving family man can come to participate in a violent, murderous event."  Id.

In Smith v. Mullin, 379 F.3d 919, 923-24 (10th Cir. 2004), the defendant lost his job as a school janitor, got into a fight with his wife when he told her, and then killed her and her four children, three by stabbing and two by asphyxiation.  In the second stage, trial counsel's mitigation case was "a mere thirty pages" of testimony from the defendant's family and friends who testified that that they loved the defendant and "that

he was a kind and considerate person." Id. at 939. The Tenth Circuit found that trial counsel was ineffective because he "made no attempt to explain how this kind and considerate person could commit such a horrendous crime . . . ." Id. Because the defendant had brain damage which trial counsel failed to discover, "the jury . . . never received an explanation for his behavior." Id. at 943. Expert testimony could have shown that the defendant's brain damage affected his ability to regulate his emotions, and it could have given the jury "an *explanation* of how [the defendant's] organic brain damage caused [his] outbursts of violence and caused this 'kind hearted' person to commit such a shocking crime." Id.

In denying Petitioner relief, the OCCA concluded that the mental health condition found by Dr. McGarrahan did not explain Petitioner's crimes, or as the Tenth Circuit stated in Hooks, 689 F.3d at 1204, it did not "connect the dots between . . . [Petitioner's] mental problems, life circumstances, and personal history and . . . his commission of the crime[s] in question." Although Dr. McGarrahan found brain damage, her diagnosis was dementia, a condition which Dr. McGarrahan concluded affected Petitioner's memory, planning, reasoning, and organizational skills. *Rule 3.11 Application* at Exhibit 1-B, p. 12. But unlike the mental health conditions found in Hooks, Anderson, and Smith,[5] the OCCA found that Petitioner's mental deficiencies did not relate to his crimes. In fact, they were in opposition to "other undisputed evidence of how [Petitioner] carried out [his] crimes." Grissom, 253 P.3d at 995. Although the OCCA did not set forth all of the

---

[5] An additional difference between these cases and Petitioner's case is the application of AEDPA deference. Hooks, Anderson, and Smith were all granted relief under de novo review. Hooks, 689 F.3d at 1195; Anderson, 476 F.3d at 1142; Smith, 379 F.3d at 927, 929.

ways in which Dr. McGarrahan's opinion conflicted with the presented evidence, its failure to do so does not detract from its conclusion. See Richter, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). And, in any event, the Court notes that Respondent, in defending the OCCA's decision as one within the bounds of reason, has shown in detail how the evidence presented at trial belies Dr. McGarrahan's findings that Petitioner had deficiencies in memory, planning, reasoning, and organization which contributed to his crimes. Response, pp. 18-22.[6]

Petitioner's circumstances are more like those in Wilson. In Wilson, the defendant asserted that his trial counsel was ineffective with respect to the development and presentation of his mental health issues. Although a mental health expert testified in mitigation, the defendant asserted that had trial counsel done more, the jury could have been provided with a better picture of his mental health which could have resulted in a sentence less than death. Wilson, 706 F.3d at 1293-94. The Tenth Circuit found that although the same expert who testified at trial was able to arrive at a potentially stronger diagnosis after trial, the defendant was not entitled to Strickland relief. A key component of the Court's holding was the defendant's failure to show how this new diagnosis

---

[6] Even though Petitioner clearly disagrees with both the OCCA's and Respondent's assessment of the evidence, arguing that his crimes were "pathetically **un**-orchestrated" and "**brain-damaged in nature**[,]" Petition, p. 13, there is little doubt that had Dr. McGarrahan testified at trial, the prosecution would have successfully challenged the credibility of her opinion by cross-examining her on how her diagnosis failed to relate to the commission of the crimes. See Wilson, 706 F.3d at 1305-06 (acknowledging that omitted mitigation evidence is not to be considered in a vacuum and that a valid consideration is the prosecution's response to the evidence).

affected his participation in the murder. The Court noted that "[a]lthough [the expert] testified that knowing that Defendant suffered from schizophrenic paranoid personality disorder might help a jury understand Defendant's 'motivation' for committing the crime, there was no credible evidence that Defendant acted as a result of delusions or hallucinations." Just as the OCCA found in Petitioner's case, the Tenth Circuit denied relief because the evidence of the defendant's behavior during the crime did not tie into the mental disorder from which he allegedly suffered. Id. at 1297-98, 1309-10 (citation omitted).

In order for the Court to find for Petitioner on this claim, Petitioner must show that the OCCA's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Simply stated, he must show that all fairminded jurists would agree with him that the OCCA got it wrong. Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014). Here that means that all fairminded jurists would agree that the OCCA was incorrect to consider Petitioner's dementia in light of the presented evidence and the very circumstances of his crimes. For the reasons set out above, the Court concludes that Petitioner has failed to make this showing.

### Claims Raised in Post-Conviction

In his post-conviction proceeding, Petitioner continued his charge against his trial counsel for their performance in the second stage case. Beyond what he raised on direct appeal, Petitioner made four additional claims against his trial counsel, including failing to: (1) hire a mitigation specialist; (2) investigate and present evidence of his history of

being a well-behaved inmate; (3) investigate and present evidence of the sexual advances and assaults he had to endure when previously imprisoned; and (4) discover and present evidence of his good character from his ex-wife and her family. *Application for Post-Conviction Relief* at 12-21. The OCCA found that these claims were procedurally barred due to Petitioner's failure to raise them on direct appeal; however, it also reviewed these claims through the lens of appellate counsel ineffectiveness and found no Strickland error. Grissom, No. PCD-2008-928, slip op. at 3-7. Although Respondent asserts that these claims should be procedurally barred in this proceeding, Petitioner presents multiple arguments as to why the Court should proceed to their merits. For the following reasons, the Court agrees with Respondent.

When a state court applies a state procedural rule to preclude merits consideration of a claim, a federal habeas court will follow suit if the rule is one which "is independent of the federal question and adequate to support the judgment." Coleman, 501 U.S. at 729. "To be independent, the procedural ground must be based solely on state law." Thacker v. Workman, 678 F.3d 820, 835 (10th Cir. 2012) (citing English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998)). "To be adequate, the procedural ground 'must be strictly or regularly followed and applied evenhandedly to all similar claims.'" Thacker, 678 F.3d at 835 (quoting Sherrill v. Hargett, 184 F.3d 1172, 1174 (10th Cir. 1999)).

The OCCA found that Petitioner had waived these additional instances of trial counsel ineffectiveness because he failed to raise them on direct appeal. The OCCA noted that Petitioner was represented by separate counsel at trial and on direct appeal, and that the claims were "'ascertainable through the exercise of reasonable diligence on or

before the time of the direct appeal.'" Grissom, No. PCD-2008-928, slip op. at 2-6 (quoting Okla. Stat. tit. 22, § 1089 (D)(4)(b)(1)).

Petitioner's first challenge to the OCCA's ruling is his assertion that it is ambiguous. Recognizing that Petitioner had raised a direct appeal challenge to trial counsel's presentation of the second stage case, the OCCA noted at the onset that to the extent Petitioner was attempting to re-raise his direct appeal claim, it was "*res judicata* and barred from post-conviction review." Grissom, No. PCD-2008-928, slip op. at 4. The OCCA then found, as set forth above, that Petitioner's new challenges to his trial counsel's representation were waived. Petitioner contends that because "[t]he OCCA did not specify what part of [his] post-conviction claim was res judicata and what part was waived[,]" the procedural bar should not apply. Petitioner also argues that the OCCA's res judicata ruling invokes the principles of Cone, 556 U.S. at 467, mandating that this Court conduct a merits review of his aggregate trial counsel mitigation claim including "the post-conviction material" he provided. Petition, p. 19.

The OCCA's opinion is not ambiguous. On direct appeal, Petitioner argued that his trial counsel were ineffective for failing to present evidence of his dementia. The OCCA rejected this claim on the merits, and this Court has likewise denied relief. Although Petitioner's post-conviction claims against his trial counsel also relate to the mitigation case presented, they are undoubtedly different from his direct appeal claim, as the OCCA found.

> Direct appeal counsel raised a similar claim that trial counsel was ineffective for failing to adequately investigate and present mitigating evidence, particularly evidence of Petitioner's troubled background and his

alleged dementia resulting from birth complications, a history of head injury, and his chronic abuse of alcohol. <u>Grissom</u>, 2011 OK CR 3, ¶¶ 78-79. To the extent that his current claim reasserts issues raised and adjudicated on direct appeal, the claim is *res judicata* and barred from post-conviction review. <u>Davis</u>, 2005 OK CR 21, ¶ 2, 123 P.3d at 244.

In the current claim, Petitioner again asserts that trial and appellate counsel failed to investigate, develop, and discover "compelling mitigating evidence" that "would have further explained [Petitioner's] background, mental illness, and history" to the jury. Petitioner now argues that trial and appellate counsel unreasonably failed to present evidence of his "ability to make a positive adjustment to incarceration," as well as evidence of "the realities of incarceration" in the Texas prison system, including Petitioner's well-founded fear of sexual assault in prison. Petitioner also submits an affidavit from his ex-wife stating that he admitted being sexually assaulted in prison and paying for protection from sexual assault while in prison. Petitioner also submits affidavits from his ex-wife, his ex-wife's mother, and his ex-wife's brother, expressing favorable aspects of his character, describing him as "the best husband in the world," the "best son-in-law a mother could ask for," and a good person who must have been "off his rocker" when he committed these crimes. Petitioner alleges these witnesses "were willing to provide evidence for [Petitioner's] defense, but were not contacted or utilized" by defense counsel at trial or on appeal.

. . . .

Petitioner's ex-wife testified at trial, and on cross-examination, expressed some of the favorable aspects of Petitioner's character presented here. Petitioner's defense team included a professional investigator who developed mitigation evidence of his family and marital history that was presented at sentencing. Two mental health professionals evaluated Petitioner's social and psychological background and testified extensively to their findings during the sentencing stage. Petitioner presented mitigating evidence suggesting his positive adjustment to incarceration, his troubled background, and his chronic alcoholism. Any favorable character evidence available from Petitioner's ex-wife, ex-mother-in-law, and ex-brother-in-law was certainly ascertainable at the time of trial or, at the latest, on direct appeal, by the exercise of due diligence.

<u>Grissom</u>, No. PCD-2008-928, slip op. at 4-5.

By acknowledging the related direct appeal claim (and refusing to revisit it), the OCCA in no way undercut its application of a waiver to the new claims Petitioner was presenting for the first time on post-conviction. As his reliance on Cone further shows, Petitioner, in an effort to bootstrap his post-conviction claims to his direct appeal claim, is trying to create confusion where none exists. In Cone, 556 U.S. at 467, the Supreme Court held that

> [w]hen a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted. To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is *ripe* for federal adjudication.

Here, the very claim that the OCCA refused to hear in post-conviction was the claim Petitioner had already raised on direct appeal, and consistent with Cone, this Court has adjudicated that claim. However, Cone does not apply to Petitioner's post-conviction claims, and the Court therefore rejects Petitioner's ambiguity argument in its entirety.

Next, Petitioner alleges inadequacy with respect to Rule 3.11. Once again asserting that the Rule 3.11 standard is higher than the Strickland standard, Petitioner argues that he did not have the opportunity to develop his additional trial counsel mitigation claims on direct appeal. Petition, pp. 19-20, 99. However, as previously discussed, the very reason Petitioner claims Rule 3.11 is inadequate has been specifically rejected by the Tenth Circuit in Lott. Therefore, Petitioner cannot rely upon this assertion to avoid the application of a procedural bar to his claim. See English, 146 F.3d at 1264 (recognizing Oklahoma's procedural bar of trial counsel claims not raised on direct

appeal where (1) trial and appellate counsel were different and (2) Rule 3.11 is adequately and evenhandedly applied).[7]

Petitioner also challenges the adequacy and independence of the procedural bar applied to his claims based on the OCCA's decision in <u>Valdez v. State</u>, 46 P.3d 703 (Okla. Crim. App. 2002). Petitioner asserts that because <u>Valdez</u> gives the OCCA discretion to grant relief on claims which would otherwise be precluded from merits review due to the OCCA's own procedural rules, the OCCA's procedural rules are not consistently applied. Petitioner also claims that because the OCCA must necessarily review the underlying claim in order to evaluate whether <u>Valdez</u> relief is warranted, the OCCA's rules are not independent. Petition, pp. 19, 99-100. This argument, however, has been rejected by the Tenth Circuit. <u>Fairchild v. Trammell</u>, 784 F.3d 702, 719 (10th Cir. 2015), <u>cert. denied</u>, 136 S. Ct. 835 (2016); <u>Williams v. Trammell</u>, 782 F.3d 1184, 1213 (10th Cir. 2015), <u>cert. denied</u>, 136 S. Ct. 806 (2016); <u>Banks v. Workman</u>, 692 F.3d 1133, 1145-47 (10th Cir. 2012).

Finally, Petitioner asserts that he can overcome the application of a procedural bar to his post-conviction claims by satisfying the cause and prejudice exception. In <u>Coleman</u>, 501 U.S. at 750, the Supreme Court held that a habeas petitioner can obtain merits review of a claim he defaulted in state court by "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law . . . ."

---

[7] Respondent has cited numerous cases in support of Rule 3.11's adequacy. Response, pp. 27-28. In the reply, Petitioner makes no attempt to counter Respondent's showing, but instead reasserts his <u>Cone</u> argument and argues ineffective assistance of appellate counsel as cause and prejudice to excuse the application of a procedural bar to these claims. Reply, pp. 3-4. <u>See</u> Ground Ten, <u>infra</u> (discussing petitioner's burden when respondent raises a procedural bar defense).

Petitioner's alleged cause is that his appellate counsel were ineffective for failing to raise the claims on direct appeal. Petition, p. 20. See Ryder ex rel. Ryder v. Warrior, 810 F.3d 724, 747 (10th Cir. 2016) ("A claim of ineffective assistance of appellate counsel can serve as cause and prejudice to overcome a procedural bar, if it has merit."). Petitioner made this same argument to the OCCA. Applying Strickland, the OCCA found that Petitioner had failed to show that his appellate counsel was constitutionally ineffective. Grissom, No. PCD-2008-928, slip op. at 6-7. In particular, the OCCA held:

> [W]e are not convinced that Petitioner's submissions demonstrate ineffective assistance of counsel. Appellate counsel conducted a competent mitigation investigation on direct appeal, and sought to supplement the appellate record with the results of that investigation. Appellate counsel also raised several non-frivolous issues on appeal, including claims of ineffective assistance of trial counsel equal or superior to the current claims in terms of their overall merit. Petitioner has not included any information in this application to show that counsel's failure on direct appeal to pursue this particular mitigation claim, in this particular way, was not the result of sound strategy. Appellate counsel is not required to raise every non-frivolous issue on appeal. Harris v. State, 2007 OK CR 32, ¶ 5, 167 P.3d 438, 442. Because Petitioner has not shown that appellate counsel's omission of this information on direct appeal was unreasonable under prevailing professional standards, he cannot show entitlement to relief under Strickland.

Id. at 7. The Court owes AEDPA deference to this determination. Ryder, 810 F.3d at 746 (citing Turrentine v. Mullin, 390 F.3d 1181, 1202 (10th Cir. 2004)).

Claims regarding the effectiveness of appellate counsel are governed by Strickland, which the OCCA applied. Milton v. Miller, 744 F.3d 660, 669 (10th Cir. 2014) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000)). In accordance with Strickland, a petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for

counsel's unreasonable actions, he would have prevailed on appeal.  <u>Robbins</u>, 528 U.S. at 285-86; <u>Miller v. Mullin</u>, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1186-87 (10th Cir. 2002)).   As previously discussed with respect to Petitioner's dementia claim, both <u>Strickland</u> and the AEDPA are highly deferential standards, "and when the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (citation omitted).

In an attempt to show that the OCCA's ruling on his appellate counsel claim is unreasonable, Petitioner asserts that the OCCA's rationale was "unsound and unconvincing."  Petitioner additionally states that the OCCA's evaluation of the claims raised on direct appeal to the claims Petitioner asserts should have been raised was "irrelevant and unhelpful."  Petition, p. 20.  However, the Court finds that Petitioner's arguments fall far short of showing that the OCCA's ruling is unreasonable.

When an appellate counsel claim concerns omitted issues, <u>Strickland's</u> first prong requires a showing that counsel unreasonably omitted "nonfrivolous issues."  <u>Robbins</u>, 528 U.S. at 285.  When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim.  <u>Id.</u> at 288.  Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit.  In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . ."  <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (quoting  <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983)). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on

briefs are widely imposed." <u>Jones</u>, 463 U.S. at 752-53. The OCCA's determination of Petitioner's appellate counsel claim is consistent with this authority. The omitted claims Petitioner faults his appellate counsel for not raising on direct appeal are not as legally compelling as Petitioner asserts, and therefore this is not a situation where all fairminded jurists would agree that the OCCA got it wrong. The OCCA's decision is entitled to double deference, and in light of the same, the Court concludes that the OCCA reasonably denied Petitioner relief. Accordingly, Petitioner has not shown adequate cause to overcome his default.

For the foregoing reasons, the Court concludes that Petitioner has given no valid reason to overcome the application of a procedural bar to the additional trial counsel ineffectiveness claims he raised in post-conviction. They are, therefore, procedurally barred.

### 3. Trial Counsel's Failure to Request Jury Instructions.

Related to the jury instruction challenges he brings in his Grounds Three (defense of voluntary intoxication and lesser included offenses), Four (victim impact), and Five (mitigation), Petitioner asserts here that trial counsel were ineffective for failing to request "[c]ritically [i]mportant" jury instructions. Petition, p. 31. In denying this ineffectiveness claim, the OCCA held that because it found no prejudicial error related to the jury instructions, Petitioner could not obtain relief under <u>Strickland</u> because he could not "show a reasonable probability that, but for counsel's allegedly unprofessional errors, the outcome of the trial would have been different." <u>Grissom</u>, 253 P.3d at 994. Having also explored the underlying claims and determined that the OCCA did not act

unreasonably in denying Petitioner relief on the same, the Court makes the additional determination here that the OCCA was not unreasonable in denying this related challenge to his trial counsel's representation.  See Hanson v. Sherrod, 797 F.3d 810, 839 (10th Cir. 2015) (refusing to analyze a petitioner's ineffectiveness claim based on trial counsel's failure to object to instances of prosecutorial misconduct where the underlying instances of alleged misconduct were without merit), cert. denied, 136 S. Ct. 2013 (2016).  See also Freeman v. Attorney General, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . ."); Snow v. Sirmons, 474 F.3d 693, 724-25 (10th Cir. 2007) (trial counsel was not ineffective for failing to object to certain evidence that the OCCA found admissible); Spears v. Mullin, 343 F.3d 1215, 1249 (10th Cir. 2003) (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found that sufficient evidence supported the giving of the instruction).

Regarding trial counsel's failure to request lesser included instructions, the Court notes that Petitioner does not fault his counsel for confessing guilt in the first stage but instead disputes the fact that trial counsel did so.  Relying on affidavits executed by trial counsel some four and a half years after trial and over a year and a half after the OCCA decided this claim on direct appeal,[8] Petitioner also asserts that trial counsel's failure to request these instructions "was borne of ignorance not strategy."  Petition, p. 34.  As detailed in Ground Three, infra, the trial transcript supports the OCCA's finding that trial

---

[8] Again, the Court cannot consider Petitioner's later-developed evidence.  Pinholster, 563 U.S. at 181.

counsel confessed guilt.  Because trial counsel confessed guilt and did so with Petitioner's express consent, trial counsel cannot be deemed ineffective for failing to request lesser included instructions.

### 4. Trial Counsel's Failure to Object to the Prosecutor's Second Stage Closing Argument.

Petitioner's final charge against his trial counsel is their failure to object to any of the prosecutor's allegedly improper arguments which comprise his Ground Seven. As with his previous challenge to counsel's conduct, the OCCA addressed this claim on the merits and denied relief due to the absence of Strickland prejudice.  Grissom, 253 P.3d at 993-94.  Affording AEDPA deference, and with consideration to the substance of the underlying prosecutorial misconduct claims, the Court finds that the OCCA's determination is a reasonable one.  Hanson, 797 F.3d at 839.

### 5. Ineffective Assistance of Appellate Counsel.

Lastly, Petitioner reiterates that if his appellate counsel failed to "rais[e] each and every instance of trial counsel's ineffectiveness as well as all errors exiting [sic] both in *and outside the record*[,]" then they were ineffective.  Petition, p. 35.  In his Grounds One, Two, and Nine, Petitioner has faulted his appellate counsel for failing to raise certain claims.  Because the Court has addressed the appellate counsel component within each particular ground, it is unnecessary to elaborate further here.  Petitioner is not entitled to relief based on a claim of appellate counsel ineffectiveness.

### 6. Conclusion.

For the reasons set forth herein, the Court has concluded that Petitioner has failed to show his entitlement to relief based on the ineffectiveness of his trial and appellate counsel. Accordingly, Ground One is denied in its entirety.

### B. Ground Two: Eighth Amendment Execution Challenge.

In Ground Two, Petitioner asserts that because his "severely malformed and damaged brain significantly impairs his ability to exercise rational judgment and conform his conduct to the requirements of the law[,]" the Eighth Amendment prohibits his execution. Petition, p. 39. Petitioner raised this claim in post-conviction; however, the OCCA procedurally barred it, finding that Petitioner should have raised the claim on direct appeal. The OCCA additionally found that his appellate counsel was not ineffective for failing to raise the claim. Grissom, No. PCD-2008-928, slip op. at 10-13. Respondent asserts that this Court should procedurally bar Petitioner's second ground for relief but also argues that the claim lacks merit. Petitioner questions whether the OCCA found the claim waived but also asserts that a procedural bar can be overcome by his appellate counsel's ineffectiveness. Petitioner cites both Atkins v. Virginia, 536 U.S. 304 (2002), and Roper v. Simmons, 543 U.S. 551 (2005), in support of his request for relief.[9]

---

[9] In his post-conviction application, Petitioner argued that execution of the severely mentally ill constitutes cruel and unusual punishment. Based on Dr. McGarrahan's report, Petitioner asserted that his dementia diagnosis placed him in the severely mentally ill category. He cited both Atkins and Roper (among other authority) in support of his claim. Grissom, No. PCD-2008-928, slip op. at 10-11; *Application for Post-Conviction Relief* at 31-35. In light of new evidence Petitioner has obtained, evidence which has never been presented to the OCCA,

In refusing to reach the merits of Petitioner's Ground Two, the OCCA found that both the legal and factual basis for the claim was available at the time of his direct appeal. Grissom, No. PCD-2008-928, slip op. at 11. This finding supported its ultimate conclusion that the claim had been waived. Id. at 13. As the OCCA stated,

> The Post-Conviction Procedure Act was neither designed nor intended to provide applicants another direct appeal. Claims which could have been raised in previous appeals but were not are generally waived in post-conviction proceedings . . . . The only issues authorized by the post-conviction statute are those that "[w]ere not and could not have been raised in a direct appeal," which "support a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." 22 O.S.Supp.2006, § 1089(C).

Id. at 2 (citation omitted). Therefore, contrary to Petitioner's first argument, it is clear that the OCCA found his Ground Two waived and that such waiver was based on a state procedural rule.

Regarding Petitioner's stated cause, that his appellate counsel was ineffective for failing to raise this claim on direct appeal, the OCCA offered the following analysis:

> The Eighth and Fourteenth Amendments to the United States Constitution, as well as the Oklahoma Statutes, prohibit the execution of a person who suffers from mental retardation or insanity. Atkins; Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); 21 O.S.Supp.2006, § 701.10b(B); 22 O.S.2001, § 1005 (2001) *et seq.* On direct appeal, this Court found that Dr. McGarrahan's testimony and related evidence did not create a strong possibility that trial counsel was ineffective in failing to develop and utilize this additional evidence of Petitioner's dementia or cognitive impairments at trial. We found that this evidence of dementia or significant cognitive impairment was contradicted by other facts and dubious at best, and thus insufficient to show deficient

---

Petitioner has included in his Ground Two more detail regarding his mental dysfunction, brain damage, and cognitive function. As discussed herein, this additional detail does not enter into the Court's adjudication of the claim.

performance by trial counsel or any reasonable probability of a different outcome at trial. Grissom, 2011 OK CR 3, ¶ 82.

> The Supreme Court has not extended its Eighth Amendment holdings in Ford, Atkins, and Roper to prohibit executions of persons who suffer "severe mental illness." We decline to find any such prohibition generally exists in the state or federal constitutional bans on cruel and/or unusual punishments; and even if it did, the facts show that Petitioner's cognitive functioning at the time of these crimes did not significantly impair his capacity to appreciate the nature or wrongfulness of his conduct; to exercise rational judgment, or to conform his conduct to the requirements of the law. In sum, the lack of substantive factual and legal merit to this claim precludes a finding that appellate counsel was ineffective in failing to raise the issue in a direct appeal. Smith, 2010 OK CR 24, ¶ 11, 245 P.3d at 1237-38. The issue is waived, and no relief is required.

Grissom, No. PCD-2008-928, slip op. at 12-13. As previously noted, the Court owes AEDPA deference to this determination, Ryder, 810 F.3d at 746, and the Court finds that Petitioner has not shown this determination to be unreasonable.

First, because the vast majority of Petitioner's argument is based on evidence which was not before the OCCA when it decided that his appellate counsel were not ineffective for failing to raise this claim, the Court cannot consider it. Pinholster prevents Petitioner from undercutting the OCCA's ruling with evidence that the OCCA did not have. Pinholster, 563 U.S. at 181. Second, for the reasons set forth in Ground One, supra, Petitioner's challenges here to the OCCA's assessment of Dr. McGarrahan's opinion are without merit. The Court has already determined that the OCCA did not act unreasonably in finding that Dr. McGarrahan's dementia diagnosis did not correlate to the manner in which Petitioner carried out his crimes, and nothing Petitioner re-urges here convinces the Court otherwise. And finally, despite Petitioner's assertion that he would have been spared the death penalty if his appellate counsel had raised this claim,

Reply, p. 8, the law does not support this conclusion. As the OCCA noted, there is no Supreme Court authority which supports Petitioner's claim. Grissom, No. PCD-2008-928, slip op. at 12. In Atkins, 536 U.S. at 321, the Supreme Court found that the Eighth Amendment prevents the execution of mentally retarded defendants, and in Roper, 543 U.S. at 578, the Supreme Court extended the execution ban to juvenile defendants. These, however, are the only categorical exclusions to date. See Hall v. Florida, 572 U.S. ___, 134 S. Ct. 1986, 1992 (2014) (citing Atkins and Roper in its acknowledgment that "[t]he Eighth Amendment prohibits certain punishments as a categorical matter"). Petitioner's argument that the principles and rationales which justify the holdings of Atkins and Roper can be extended to cover his cognitive dysfunction is unavailing. See Fairchild, 784 F.3d at 710 ("Federal courts may not 'extract clearly established law from the general legal principles developed in factually distinct contexts,' and Supreme Court holdings 'must be construed narrowly and consist only of something akin to on-point holdings[.]'") (quoting House v. Hatch, 527 F.3d 1010 (10th Cir. 2008)).

For the foregoing reasons, the Court finds that Petitioner's Ground Two is procedurally barred.

**C.     Ground Three:     First Stage Jury Instructions.**

In Ground Three, Petitioner makes two challenges to the first stage jury instructions, both related to the defense of voluntary intoxication. Petitioner asserts that (1) the instructions regarding intoxication as a defense were incomplete and confusing and (2) he should have received instructions on lesser included offenses (second degree murder and/or manslaughter) as part of his intoxication defense. Petitioner contends that

the absence of lesser included instructions constitutes a violation of <u>Beck v. Alabama</u>, 447 U.S. 625 (1980). Petitioner additionally contends that these errors violated his right to present a complete defense and his right to a fair trial. Petitioner raised this claim on direct appeal. The OCCA thoroughly addressed Petitioner's claim, but ultimately found that he was not entitled to any relief because his trial counsel, with Petitioner's on-the-record consent, unabashedly admitted Petitioner's guilt in the first stage. The OCCA additionally found that because the presented evidence did not support the giving of instructions on the defense of voluntary intoxication, Petitioner was not entitled to relief based on any error associated with the intoxication instructions that were given. <u>Grissom</u>, 253 P.3d at 979-85. AEDPA deference applies to this merits determination.[10]

In <u>Beck</u>, the Supreme Court addressed the constitutional ramifications of lesser included instructions for a capital crime. Prior to <u>Beck</u>, the Supreme Court had "never held that a defendant is entitled to a lesser included offense instruction as a matter of due process." <u>Beck</u>, 447 U.S. at 637. In <u>Beck</u>, however, the Supreme Court carved out an exception for those high stake cases where the death penalty is a possible punishment.

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

---

[10] Concluding that Petitioner is not entitled to relief on Ground Three pursuant to Section 2254(d), the Court has not considered Petitioner's Exhibits 6, 7, 22, and 26, which were not presented to the OCCA in its consideration of Petitioner's Ground Three. <u>Pinholster</u>, 563 U.S. at 181.

> Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments . . . .

Id. Beck, therefore, requires a trial court in a capital case to give the jury a third option to convict the defendant for a lesser included non-capital offense, when such lesser offense is supported by the evidence. Id. at 627.

The Tenth Circuit has repeatedly held that a petitioner may not prevail on a Beck claim premised on a lesser included instruction he failed to request at trial. Grant v. Trammell, 727 F.3d 1006, 1011-13 (10th Cir. 2013). In Grant, the Tenth Circuit, citing its holding in Hooks v. Ward, 184 F.3d 1206 (10th Cir. 1999), noted that "[t]he Hooks rule is federal in nature, an explanation of what's required as a matter of federal due process doctrine to invoke Beck." Grant, 727 F.3d at 1011. "[A] state generally won't be said to offend a defendant's due process right to particular jury instructions when it has no occasion to refuse a request for them." Id. at 1012. Since Hooks, the Tenth Circuit has "expressly and repeatedly" denied Beck relief in the absence of a request for the instruction at trial. Id. (citing Thornburg v. Mullin, 422 F.3d 1113, 1126-27 (10th Cir. 2005); Darks v. Mullin, 327 F.3d 1001, 1007 (10th Cir. 2003); Hogan v. Gibson, 197 F.3d 1297, 1303 n.3 (10th Cir. 1999); and Smith v. Gibson, 197 F.3d 454, 464 (10th Cir. 1999)).

Petitioner did not request a lesser included instruction. In fact, trial counsel did not file a written request for any instructions and the trial transcript does not show that any oral requests were made either. Under the foregoing Tenth Circuit authority, this precludes Petitioner's claim for Beck relief. Nevertheless, Petitioner makes two

arguments to avoid application of this binding circuit precedent. The first is that the Hooks holding is not really a holding at all. Petition, pp. 55-56. However, this very argument was dispelled in Grant, 727 P.3d at 1012-13. Petitioner's second argument is that by asking the trial court to include a definition of alcohol in the jury instructions, he tacitly requested lesser included instructions (Tr. VII, 17). Petition, p. 56. The Court cannot agree to this stretch of the record. Trial counsel made no mention of lesser included offenses when he requested two changes to the trial court's instructions (Tr. VII, 17-18).

In denying Petitioner relief, the OCCA did not rest its holding on Petitioner's failure to request a lesser included instruction. Instead, looking at the bigger picture, the OCCA held that by admitting his guilt in the first stage and "electing a sentencing stage defense, [Petitioner] foreclosed his claim to first-stage jury instructions on lesser-included offenses." Grissom, 253 P.3d at 982. This conclusion finds support in Beck. As noted above, Beck applies when a defendant's guilt is overwhelming, but yet there remains "some doubt with respect to an element that would justify conviction of a capital offense." Beck, 447 U.S. at 637. Because Petitioner confessed guilt in the first stage, there was no doubt which would support the giving of a lesser included offense instruction. See *Order Denying Petition for Rehearing and Directing Issuance of Mandate* at 2-9 (rejecting Petitioner's assertion that the OCCA's decision conflicted with Beck).

In its opinion, the OCCA noted Petitioner's on-the-record consent to the strategy of confessing guilt in the first stage, along with numerous statements made by trial

counsel starting in voir dire.  Grissom, 253 P.3d at 980-81.  The OCCA described the record as being "replete with counsel's statements that [Petitioner] was admitting he committed first degree murder and the other crimes alleged, and was simply seeking to persuade the jury to spare his life due to his remorse and other mitigation evidence[,]" and it concluded that "[d]efense counsel at no point contested [Petitioner's] guilt of first degree murder." Id. at 981.  With reference to the Supreme Court's decision in Florida v. Nixon, 543 U.S. 175 (2004), the OCCA additionally noted the viability of pursuing such a strategy when, as in Petitioner's case, there was overwhelming evidence of guilt.  Grissom, 253 P.3d at 981-82.

Petitioner vehemently protests the OCCA's conclusion that he confessed guilt in the first stage.  He insists that while that may have been the strategy during voir dire and at the beginning of the trial (when trial counsel declared the same on the record and Petitioner consented to it – Tr. IV, 3), he argues that a defense based on voluntary intoxication evolved as the trial went on.  In support of his strategy evolution argument, Petitioner argues that the trial court would not have given any intoxication instructions unless the defense had been raised.  He also points to his closing argument, wherein trial counsel noted the defense of intoxication instruction and discussed the amount of alcohol Petitioner had consumed since the night before the murder.

The OCCA's determination that Petitioner confessed his guilt in the first stage is a finding of fact.  The AEDPA has two provisions which govern state-court factual determinations.  Section 2254(d)(2) permits habeas relief where the state court rendered "a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding[,]" and Section 2254(e)(1) affords a presumption of correctness to state court factual determinations that can only be rebutted by clear and convincing evidence. Because the Supreme Court has not yet decided the relationship between these provisions, the Court will assess Petitioner's challenge to the OCCA's conclusion under Section 2254(d)(2), the one most favorable to him. Brumfield v. Cain, 576 U.S. ___, 135 S. Ct. 2269, 2282 (2015); Titlow, 134 S. Ct. at 15; Wood v. Allen, 558 U.S. 290, 299-301 (2010); Grant, 727 F.3d at 1024 & n.6. Even under Section 2254(d)(2), however, Petitioner's ability to obtain relief is limited. Although Section 2254(d)(2) is less deferential to the state court's factual findings than Section 2254(e)(1), it is nevertheless "restrictive." Johnson v. Williams, 568 U.S. ___, 133 S. Ct. 1088, 1092 (2013). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood, 558 U.S. at 301.[11]

The Court finds that Petitioner has not shown that the OCCA made an unreasonable determination by concluding that he had confessed guilt in the first stage. In addition to numerous admissions that Petitioner committed premeditated murder by

---

[11] Under Section 2254(d)(2), Petitioner must show that the OCCA based its decision on the factual determinations he questions. Grant, 727 F.3d at 1023-24 (emphasizing the "based on" language of Section 2254(d)(2) and noting that findings which "concerned only subsidiary issues that the OCCA mentioned in passing" would not satisfy Section 2254(d)(2)). While the OCCA's determination that Petitioner confessed guilt in the first stage was clearly a basis upon which it denied Petitioner's Ground Three, Petitioner has challenged other factual determinations made by the OCCA. Petition, pp. 49-50 (whether, on the day before the murder, Petitioner and his co-defendant discussed plans to commit crimes for money; the location of Petitioner's hotel – Oklahoma City or Del City; and the OCCA's description of the altercation between Petitioner and the surviving victim, Dreu Kopf). Because these are all collateral facts, none of which even remotely served as a basis for the OCCA's determination of Petitioner's Ground Three (or any of his other grounds), they cannot serve as a basis for relief under Section 2254(d)(2).

killing an innocent young lady in cold blood, trial counsel repeatedly stated that the defense would offer absolutely no excuse for Petitioner's actions:

- "[Petitioner] shot and murdered a beautiful 23 year old girl in cold blood" (Tr. I, 124).

- "Tell me your views on the death penalty . . . [f]or somebody who is completely guilty of murder in the first degree. There is no insanity. There is no self defense. There is no intoxication. There is no mitigation. Someone completely guilty of murder in the first degree. . . . [T]here is no reason for this crime. There is no reason. We have tried to figure it out. There is none. There is none" (Tr. I, 126).

- "Well you are going to hear the police evidence and the witnesses and they are going to tell you what I told you. That it's murder of a beautiful 23 year old girl in cold blood and no reason for it. . . . Proven beyond a reasonable doubt which is the highest burden of the law, it's going to be" (Tr. I, 127).

- "They will introduce evidence that will prove to your satisfaction that [Petitioner] murdered 23 year old Amber Matthews in cold blood" (Tr. I, 131).

- "What do you believe might mitigate a situation like this, a crime like this where there is no question about it, innocent, not any little tiny part of the problem, he started it, he caused it, he did it, the crime that we are here on today" (Tr. I, 152).

- "[T]he evidence will show that it is a cold-blooded, calculated, premeditated act of murder and that the persons or the person that it was inflicted on, the other girl who was shot had no involvement, didn't cause it, didn't want it, do anything for it to be" (Tr. I, 170-71).

- "So under the circumstances of this case, there is no question that [Petitioner], the evidence is going to show you, these gentlemen will introduce that, will prove to your satisfaction that [Petitioner] on November 3rd, 2005 took the life of a beautiful young girl for no good reason. She had no involvement in it, caused it, anything to do with it" (Tr. I, 179).

- "You have heard me talk to lots of the other jurors about this and advised them about what happened in this senseless tragedy" (Tr. I, 180).

- "Well, I'm going to make sure that you understand that there is no question that the evidence will be there, that he is guilty of premeditated first degree murder of a beautiful young girl that had nothing to do with it at all. . . . Twenty-three years old. . . . Just happened to be over at her friend's house and her friend is shot three times. . . . She had nothing to do with it, either one of them. . . . So that's what I anticipate that the evidence that these gentlemen can introduce will be and so we have had hearings, we have seen the evidence, and I'm telling you that's what it will show" (Tr. I, 183-84).

- "Everyone involved in it except for [Petitioner] was innocent. Do you understand that?" (Tr. I, 190).

- Prospective Juror: "Yes, he is guilty. You have made that clear" (Tr. I, 195).

- "Now what do you think about the death penalty for someone who has committed a cold-blooded murder on an innocent victim? There are no defenses" (Tr. II, 115).

- "And I will tell you because we want to get people on the jury who are able to give real meaningful consideration to all of the possible penalties in the case, that the evidence in this case will show you that on November 3rd, 2005 [Petitioner], the evidence that the prosecutors will introduce will show you that he murdered a beautiful 23 year old girl and he shot another beautiful girl, neither of which had any involvement in it, they didn't cause it, they didn't have anything to do with it. That is what the evidence will show in the case" (Tr. II, 119).

- "Open and shut guilty" (Tr. II, 120).

- "He's guilty, sir. Cold-blooded, premeditated murder" (Tr. II, 124).

- "You're going to find that he is guilty of murder in the first degree" (Tr. II, 125).

- "And then we will present on behalf of [Petitioner] evidence about his life and evidence about what happened in his life that brought him to that magic day. Things like his incredible drinking problem, very drunk at the time this happened. Those are some things. They are not legal defenses to murder. They are in mitigation to whether or not, as to the penalty he should receive" (Tr. II, 126).

- "I offer no excuse for what happened and I can't figure it out and I won't be able to figure it out, but I'm going to let you know what kind of man he has been in his life and the problems he has had" (Tr. II, 127).

- "Not insane, there is no reason for what happened, senseless" (Tr. II, 130).

- "Well that is what the evidence is going to show, that on that day in November, on November 3rd, 2005 about 12:30 p.m. he shot out the window to the house where one young lady lived and ended up shooting her three times and then there was another girl in the other room holding a baby and she was shot twice in the head. And that is what the evidence will show that these gentlemen will introduce in this case" (Tr. II, 152).

- "It will be a clear cut case of murder in the first degree, I can assure you of that" (Tr. II, 162).

- "[T]he first stage is the evidence where you decide whether or not [Petitioner] is guilty of murder in the first degree and the other crimes. And there is no question that will be the verdict of the jury" (Tr. II, 164).

- "Well, the facts are that this man killed a young lady, 23 years old, shot her in the head twice. At least the first shot while she was holding a baby. And then shot another young lady several times, three times. No, they didn't have anything to do with it, they were completely innocent, at home at 12:30 in the afternoon" (Tr. II, 170).

- "Well it will be proven that he will be guilty of murder in the first degree and in a premediated manner he took the life of a 23 year old girl who had nothing to do with it. There is no reason for it" (Tr. II, 177).

- "Well I anticipate that the evidence they produce will prove that he is guilty of murder in the first degree. . . . It will. . . . Well, if he is not guilty – and I'm telling you he is guilty. . . (Tr. II, 190).

- "But assuming that the evidence comes out like I believe it will you will find him guilty" (Tr. II, 191).

- "It's not often you hear a lawyer say his client is guilty, is it? . . . That's what the evidence will show" (Tr. III, 29).

- "[M]ake no mistake about it, there are no excuses for what [Petitioner] did that day" (Tr. III, 70).

- "[T]his crime makes no sense" (Tr. III, 78).

- "And now comes to what I ask you, ladies and gentlemen, to bear with me in this first stage of the trial and let me argue. . . . [Petitioner] has always stood up and said I did it and I'm here to face it. That's right. That's probably the hardest thing I ever had to do. I have had to stand here before you and admit that my client [Petitioner] pulled the trigger on a .44 revolver and ended the life of Amber Matthews" (Tr. III, 79).

Consistent with this strategy, trial counsel cross-examined only three of the twenty-eight witnesses presented in the State's case-in-chief (Tr. V, 57, 123-28; Tr. VI, 60-61).[12] Although trial counsel asked two of them about vodka bottles found in Petitioner's truck and one of them about the depression medication found in Petitioner's motel room, trial counsel asked no questions to these three witnesses or the many other witnesses[13] who

---

[12] Steve Neuman was recalled to the witness stand as Petitioner's sole guilt stage witness. Trial counsel asked him additional questions about the medication (Cymbalta) found in Petitioner's motel room and also questioned him about the two statements Petitioner gave and how Petitioner assisted law enforcement in finding one of the weapons he used in the commission of his crimes. Trial counsel did not ask this witness any questions related to Petitioner's intoxication (Tr. VI, 68-74). See n.13, infra.

[13] Nine testifying witnesses had contact with Petitioner: Dreu Kopf (the surviving victim), Johnny France (a farmer who gave Petitioner and his co-defendant a ride to the Hillstop Cafe

had contact with Petitioner that day regarding whether Petitioner appeared and/or acted like he was intoxicated.

Although there is surface validity to Petitioner's argument that the trial court's instructions on intoxication lend support to his assertion that the defense was raised, the record is not as supportive as Petitioner would like. First, the record contains no discussion as to why the instructions were given. The trial judge stated only that he gave the instructions he felt were appropriate (Tr. VII, 18). Second, although Petitioner argues that the defense was raised based on evidence that he was extremely, incredibly, fantastically, and unbelievably drunk (Petition, pp. 41, 45, 49; Reply, p. 11), the intoxication instructions the trial court gave dealt only with Petitioner's depression medication, not his alcoholic intake, even though trial counsel requested that alcohol be included upon learning that the trial court was sua sponte giving an intoxication instruction (Tr. VII, 9, 17). And third, as discussed below, the OCCA found that the evidence did not even warrant the giving of instructions on the defense of voluntary intoxication.

Regarding closing argument, the Court finds that, contrary to Petitioner's assertion, the OCCA's description of the same is on point. It was at most a slight modification of the strategy employed from the start. Grissom, 253 P.3d at 981. Trial counsel's closing argument was a mere two and a half pages (Tr. VII, 28-30). Trial

---

after the murder), Danny Bond (a Hillstop Cafe patron), Melvin Casion (a vendor at the Hillstop Cafe whom Petitioner asked for a ride), Brock Morgan (law enforcement), Julie Copeland (Hillstop Cafe employee), Barry Reilly (law enforcement), Steve Neuman (law enforcement), see n.12, supra, and Steve Tanio (law enforcement).

counsel discussed how Petitioner had accepted responsibility for his actions and how he (they) maintained this position at trial. Trial counsel stated:

> [Petitioner] admits to the crime. [He] is not a calculated killer. He is a lost soul whose life spiraled out of control. I take nothing away from his actions, but ask you to look at everything that happened that day and led up to these events. It's of a lost man whose alcoholism and depression spiraled into a recipe for destruction.

(Tr. VII, 29-30). Although trial counsel directed the jury's attention to the general intoxication instruction and even discussed Petitioner's drinking before the murder and his appearance on the video recorded statement, this was likely sparked by the trial court's sua sponte inclusion of intoxication instructions. Trial counsel did not argue that Petitioner lacked the mental state to be convicted of first degree malice murder and not once did he say that Petitioner was too drunk to know what he was doing.

Regarding the intoxication instructions given by the trial court, the OCCA acknowledged that they were incomplete. Grissom, 253 P.3d at 983. However, because Petitioner was not entitled to instructions on a voluntary intoxication defense in the first place, the OCCA found no error warranting relief. Id. at 983-85. Intertwined with his challenge to the trial court's failure to instruct the jury on any lesser included offense, Petitioner continues his argument here that because he was extremely, incredibly, fantastically, and unbelievably drunk, there is simply no question (in his mind) that he was entitled to instructions on a voluntary intoxication defense.

"A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden." Ellis v. Hargett, 302 F.3d 1182, 1186 (10th Cir. 2002). Because there is no constitutional right to intoxication

instructions, Petitioner "must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny [him] due process." Tiger v. Workman, 445 F.3d 1265, 1267 (10th Cir. 2006); Spears, 343 F.3d at 1244. The Supreme Court has acknowledged that where, as here, Petitioner's complaint relates to "[a]n omission, or an incomplete instruction, [it] is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). In light of AEDPA deference as well, Petitioner's ability to obtain relief on this claim is a formidable task.[14]

Whether or not Petitioner was entitled to instructions on voluntary intoxication defense is a matter of state law. In its opinion, the OCCA defined the "narrow parameters" of the defense as follows:

> 'A defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be *so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent ... element of the crime.*'

Grissom, 253 P.3d at 983 (quoting McElmurry v. State, 60 P.3d 4, 23 (Okla. Crim. App. 2002)). The OCCA ultimately concluded that "[w]hile the evidence established [Petitioner's] consumption of alcohol and prescription medication, it did not create a *prima facie* case that [Petitioner] was so intoxicated that he could not form the specific

---

[14] In separate headings, Petitioner argues that in the absence of complete and accurate instructions on the defense of voluntary intoxication, he was denied both due process and his right to present a complete defense. Petition, pp. 57-59. Because Petitioner's right to due process includes his right to present a defense, it is unnecessary to address these challenges separately. See Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

intent to commit these crimes." Grissom, 253 P.3d at 985. In support of this conclusion, the OCCA noted the following evidence which clearly showed that before, during, and after the crimes, Petitioner functioned in a manner that was inconsistent with being "utterly intoxicated":

> [Petitioner] loaded his pistols and left Oklahoma City that morning driving west. He and his accomplice bought gloves at a convenience store shortly before the crimes. He targeted an isolated rural residence for a home invasion burglary because he needed money. He parked his truck in the driveway of the home pointed toward the road for a quick getaway, telling his accomplice to follow him when the shooting stopped. He engaged his unsuspecting victims in a pretextual conversation, giving them a false name and a phony cover story, then stormed the home with gunfire. He attempted to murder the homeowner, and surely believing he had succeeded, he executed her friend with two shots to the head from his .44. He fled on a stolen four wheeler when the surviving victim took his waiting truck and made her escape. He bought and paid for a beer at a country cafe within an hour of the shootings. [Petitioner] later surrendered and cooperated with authorities in locating the murder weapon where he had discarded it shortly after his crimes.

> [Petitioner] gave a detailed confession within hours after the shootings. He was able to recount the details of his recent activities and his life history leading up to the crimes.

Id. This analysis is not unreasonable given the parameters of the defense and the applicable case law. See id. at 984 (citing Frederick v. State, 37 P.3d 908 (Okla. Crim. App. 2001), for the proposition that voluntary intoxication instructions are not warranted where the defendant's actions show use of his faculties, and Taylor v. State, 998 P.2d 1225 (Okla. Crim. App. 2000), for the proposition that the instructions are also not warranted where the defendant has the ability to recall the details of his crimes). See also Hendrix v. Trammell, 576 F. App'x 767, 769-70 (10th Cir. 2014) (noting the "specificity of impairment necessary to satisfy the requirements of [Oklahoma] law"); Bland v.

Sirmons, 459 F.3d 999, 1031 (10th Cir. 2006) (acknowledging that "[t]he OCCA has held that it belies a defense of voluntary intoxication for a defendant to have been sufficiently aware so as to be able to testify about events surrounding a murder.").

In conclusion, for the reasons set forth above, the Court concludes that because Petitioner was not entitled to intoxication instructions under state law and because he confessed guilt in the first stage and did not request any lesser included instructions, Petitioner has not shown that the OCCA acted unreasonably when it denied him relief on the claims contained in his Ground Three. Ground Three is therefore denied.

### D.   Ground Four:   No Victim Impact Instruction.

In Ground Four, Petitioner brings another challenge to the instructions. Here, Petitioner claims that he was denied due process and a reliable sentencing proceeding because the jury was not given an instruction required by state law regarding the jury's consideration of victim impact evidence. Without the instruction, Petitioner contends that "the jury was left to its own discretion on how to apply the testimony." Petition, p. 62. He argues that the harm was "incalculable." Id. at 61. Petitioner raised this claim on direct appeal, and while the OCCA found that error occurred, it also found that the error was harmless. Grissom, 253 P.3d at 991. Respondent asserts that relief should be denied because Petitioner has failed to meet the AEDPA standard for relief. The Court agrees.

The record reflects that the State presented one victim impact witness who read a brief statement prepared by the deceased's father (Tr. VII, 132-35). It is important to note that Petitioner has never challenged the content of the statement, but only the

absence of an instruction regarding the same, namely, OUJI-CR (2d) 9-45, which provides as follows:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. It is intended to remind you as the sentencer that just as the defendant should be considered as an individual, so too the victim is an individual whose death may represent a unique loss to society and the family. This evidence is simply another method of informing you about the specific harm caused by the crime in question. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence.
>
> As it relates to the death penalty: Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstance has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances.
>
> As it relates to the other sentencing options: You may consider this victim impact evidence in determining the appropriate punishment as warranted under the law and facts in the case.

In Payne v. Tennessee, 501 U.S. 808 (1991), the Supreme Court held that the Eighth Amendment does not prohibit the admission of victim impact evidence. Finding "no reason to treat such evidence differently than other relevant evidence," the Court acknowledged that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne, 501 U.S. at

827. Nothing in Payne, however, requires a capital jury to receive an instruction regarding its consideration of victim impact evidence. Therefore, the question here is simply whether the absence of one denied Petitioner a fundamentally fair trial. See Ground Three, supra (setting forth the applicable review for an omitted instruction).

In denying Petitioner relief on this claim, the OCCA found that because "the victim impact evidence . . . was brief and carefully circumscribed[,]" it "did not go to the foundation of the case or take from [Petitioner] a right essential to his defense." Grissom, 253 P.3d at 991. The OCCA found that, unlike the cases where it had granted relief for this omission, Petitioner's case was not one where the presented victim impact evidence came close to or crossed over the appropriate limits for such testimony. Id. See Payne, 501 U.S. at 825 (acknowledging that a Fourteenth Amendment violation may be found where the evidence introduced "is so unduly prejudicial that it renders the trial fundamentally unfair"). Petitioner has not shown that this conclusion is unreasonable. Petitioner's argument is nothing more than an assertion that victim impact evidence *can be* powerful and that without an instruction, the jury *may have* considered the victim impact evidence *in some unknown* inappropriate manner. The Tenth Circuit has denied habeas relief in similar challenges with stronger arguments. See Hamilton v. Mullin, 436 F.3d 1181, 1192-93 (10th Cir. 2006) (denying relief where the petitioner argued that the absence of the victim impact instruction "allowed the jury to rely on the victim impact evidence to bolster its findings of four aggravating circumstances"); Turrentine v. Mullin, 390 F.3d 1181, 1199-1201 (10th Cir. 2004) (denying relief where in addition to the lack of an instruction, the petitioner alleged that the substance of the victim impact

testimony violated his due process rights).  See also Young v. Sirmons, No. 00-00310-JHP-PJC, 2007 WL 2248158, at *18 (N.D. Okla. Aug. 2, 2007) (denying relief where the petitioner's arguments about what the jury may have done with the victim impact evidence was "mere speculation").  Relief is denied here.

**E.**    **Ground Five:**        **Mitigating Circumstances Instruction.**

In Ground Five, Petitioner asserts that the trial court gave a uniform jury instruction which prevented the jury from considering all of his mitigating evidence as mandated by Lockett v. Ohio, 438 U.S. 586, 604 (1978).  Petitioner raised this claim on direct appeal but was denied relief.  Grissom, 253 P.3d at 990-91.  Respondent asserts that Petitioner has failed to demonstrate that the OCCA's rejection of this claim is contrary to or an unreasonable application of Supreme Court law.

In Lockett, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett, 438 U.S. at 604 (footnotes omitted).  Contrary to this holding, Petitioner contends that his jury was given a definition of mitigating circumstances which limited its consideration of his mitigating evidence.  The instruction in question is Instruction No. 54, and the portion of the instruction which Petitioner takes issue with is as follows: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or

blame" (O.R. V, 664). Petitioner contends that this language "ultimately precluded consideration of [his] character and record . . . ." Petition, p. 72.

In Harris v. State, 164 P.3d 1103 (Okla. Crim. App. 2007), the OCCA reviewed the constitutionality of the very language about which Petitioner complains. The OCCA found no constitutional error with the instruction as then written. Harris, 164 P.3d at 1113 ("We do not find that the current uniform jury instruction prohibits jurors from considering mitigating evidence."). However, acknowledging that there had been instances where prosecutors had played upon the language of the instruction in an attempt to limit a jury's consideration of a defendant's mitigating evidence, the OCCA determined that the instruction should be amended.

> After careful consideration, this Court has determined that an amendment to the language of the instruction will clarify this point, and discourage improper argument. We emphasize that the language of the current instruction itself is not legally inaccurate, inadequate, or unconstitutional. Cases in which the current OUJI-CR (2d) 4-78 has been used and applied are not subject to reversal on this basis.
>
> In conjunction with this case, the Court will refer this issue to the Oklahoma Uniform Jury Instruction Committee (Criminal) for promulgation of a modified jury instruction defining mitigating circumstances in capital cases. To delineate the various purposes of mitigating evidence, this Court suggests including both (a) that mitigating circumstances may extenuate or reduce the degree of moral conduct or blame, and separately, (b) that mitigating circumstances are those which in fairness, sympathy or mercy would lead jurors individually or collectively to decide against imposing the death penalty.

Id. at 1114.

Petitioner argues that because Harris was decided before his trial, the jury should have received a modified version of OUJI-CR (2d) 4-78 as prescribed in Harris.

Petition, p. 68.  He also argues that despite the OCCA's finding in <u>Harris</u> that the instruction as then written (the instruction given in his case) was not unconstitutional, <u>Harris</u> is wrong, and therefore, when reviewing the issue in his case, the OCCA should have found that error occurred (especially in light of certain comments made by the prosecutor as hereinafter discussed) and then conducted a harmless error analysis. Because the OCCA did not follow this course of action, Petitioner requests that this Court refuse to give deference to the OCCA's decision and conduct its own harmless error analysis de novo.  Petition, pp. 70-71.

First, although <u>Harris</u> was decided some months prior to Petitioner's trial, the opinion itself did not amend the uniform instruction.  Appellate counsel even noted in the direct appeal brief that the instruction was not changed until after Petitioner's trial.  *Brief of Appellant* at 49-50 & n.48.  <u>See</u> <u>In Re: Adoption of the 2008 Revisions to the Oklahoma Uniform Jury Instructions-Criminal (Second Edition)</u>, 2008 OK CR 10 (Okla. Crim. App. Apr. 2, 2008) (adopting the change to OUJI-CR (2d) 4-78).  Second, regarding <u>Harris</u> itself, Petitioner's challenge to its holding is unpersuasive.  In <u>Hanson</u>, 797 F.3d at 850-51, the Tenth Circuit rejected a similar argument.  Reviewing the OCCA's analysis in <u>Harris</u>, the Circuit accepted "[t]he OCCA's explanation as to why it amended the instruction . . . ."  <u>Id.</u>  There is no merit, therefore, to Petitioner's argument that the OCCA's amendment of the instruction was in fact an indication of its infirmity. Likewise, Petitioner has not shown that he is entitled to de novo review of this claim.

Applying AEDPA deference, the Court concludes that Petitioner's fifth ground for relief must be denied.  In <u>Hanson</u>, 797 F.3d at 850, the Tenth Circuit acknowledged that

the proper standard of review for this claim is the one set out by the Supreme Court in
Boyde v. California, 494 U.S. 370 (1990). In Boyde, the Supreme Court addressed a
similar challenge to jury instructions which allegedly prevented the jury from considering
a defendant's "non-crime-related" mitigation evidence. Id. at 372, 375, 377-78. The
Boyde Court determined that the claim should be reviewed under the following standard:
"whether there is a reasonable likelihood that the jury has applied the challenged
instruction in a way that prevents the consideration of constitutionally relevant evidence."
Id. at 380. The Court explained:

> Although a defendant need not establish that the jury was more likely than
> not to have been impermissibly inhibited by the instruction, a capital
> sentencing proceeding is not inconsistent with the Eighth Amendment if
> there is only a possibility of such an inhibition. This "reasonable
> likelihood" standard, we think, better accommodates the concerns of
> finality and accuracy than does a standard which makes the inquiry
> dependent on how a single hypothetical "reasonable" juror could or might
> have interpreted the instruction. There is, of course, a strong policy in favor
> of accurate determination of the appropriate sentence in a capital case, but
> there is an equally strong policy against retrials years after the first trial
> where the claimed error amounts to no more than speculation. Jurors do not
> sit in solitary isolation booths parsing instructions for subtle shades of
> meaning in the same way that lawyers might. Differences among them in
> interpretation of instructions may be thrashed out in the deliberative
> process, with commonsense understanding of the instructions in the light of
> all that has taken place at the trial likely to prevail over technical
> hairsplitting.

Id. at 380-81 (footnote omitted).

In Boyde, the Supreme Court found that no constitutional violation occurred
because the instruction itself was not limiting as the defendant suggested, and in light of
other instructions given, it was "improbable that jurors would arrive at an interpretation
that precludes consideration of all non-crime-related evidence." Id. at 382-83. The Court

also found that given all of the mitigating evidence presented by the defense, it was "unlikely that reasonable jurors would believe the court's instructions transformed all of this 'favorable testimony into a virtual charade.'" Id. at 383 (quoting California v. Brown, 479 U.S. 538, 542 (1987)). And finally, the Supreme Court referenced the arguments made by the parties. Although the prosecutor had argued against the weight of the defendant's mitigating evidence, he never suggested that it should not be considered. In addition, defense counsel "stressed a broad reading" of the mitigation instruction. Id. at 384-86. In light of all of these circumstances, the Supreme Court "conclud[ed] there [was] not a reasonable likelihood that the jurors . . . understood the challenged instructions to preclude consideration of relevant mitigating evidence . . . ." Id. at 386. See also Ayers v. Belmontes, 549 U.S. 7, 12-24 (2006) (applying Boyde and Brown v. Payton, 544 U.S. 133 (2005), and finding no constitutional violation); Brown, 544 U.S. at 141-47 (applying Boyde and finding no constitutional violation).

As in Boyde, the circumstances in Petitioner's case support the OCCA's denial of relief. First, examining the instructions as a whole, it is improbable that the jury failed to consider all of Petitioner's mitigation evidence. Instruction No. 55 advised the jury that Petitioner had presented evidence of mitigating circumstances, and it specifically listed the following as mitigating circumstances:

> [Petitioner's] capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired by alcohol and/or the prescription drug of Cymbalta;
>
> [Petitioner] was under the influence of mental/emotional disturbance, including depression;

Cooperation by [Petitioner] with authorities;

[Petitioner's] age is 39;

[Petitioner's] character, including past history as a youth;

[Petitioner's] emotional/family history, including his marriage and past school problems;

[Petitioner's] conduct while being incarcerated in Texas and Blaine County, Oklahoma;

[Petitioner's] conduct in a structured setting;

[Petitioner's] family's love for him and their value of his life;

[Petitioner's] education;

[Petitioner's] remorse; [and]

[Petitioner's] acceptance of responsibility for his acts[.]

(O.R. V, 665). In addition to this lengthy list, this same instruction told the jury that it "may decide that other mitigating circumstances exist, and if so, [it] should consider those circumstances as well." Id. Instruction No. 54 also stated that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case," and the jury was advised by Instruction No. 58 that it "may consider sympathy or sentiment for the defendant in deciding whether to impose the death penalty" (O.R. V, 664, 669).

Second, it is simply unreasonable to conclude that the single sentence complained of by Petitioner caused the jury to put aside the testimony of the six witnesses presented by Petitioner in the second stage. To do so, the jury "would have had to believe that the penalty phase served virtually no purpose at all." Payton, 544 U.S. at 144.

And finally, there are the arguments of the parties. Although Petitioner complains about a portion of the prosecutor's argument, the Court cannot conclude that the OCCA was unreasonable in finding no impropriety in the statements made. Grissom, 253 P.3d at 992-93.[15] The argument to which Petitioner complains is as follows:

> Growing up there was a saying in my house whenever my brother and I did something we shouldn't have done and then we try and offer our excuse or our explanation for what we had just done that wasn't right. Whenever we did that, my mom would tell us your actions have spoken so loudly I cannot hear a word you are saying. Her simple truth applies in this case. The defendant's actions have spoken so loudly and so decisively that nothing he says can be heard. Alcohol problems, relationship problems, speech problems, none of these things even comes close to outweighing what he did. Doesn't outweigh the fact that he shot one person, that he murdered another, and he could have killed two babies. It doesn't outweigh the fact that he murdered Amber while he was out on parole and she was laying helplessly at his feet. It doesn't outweigh the fact that he is a continuing threat to society. In fact it doesn't even come close. For if it did then every child who has difficulties in school would rob and kill, if it did then every divorce and failed relationship would end in blood shed. No. His actions have spoken loudly and clearly.

> Glass shattering, Rylee screaming, Amber pleading with him not to shoot her, the loud booms of eight gunshots, all of these sounds drown out anything he has to say about his past. His actions have spoken so loudly it doesn't matter what he says. To Gary Matthews his words are hollow and empty. To Amber, his words mean nothing.

(Tr. IX, 11-12). Although Petitioner characterizes the argument as one which "exhorted the jury to ignore everything but the crime" and which "cleverly and effectively persuaded [the jurors] to think the loud volume of the crimes should keep any mitigation from being heard[,]" Petition, pp. 64, 83, the prosecutor used the words "outweigh" or

---

[15] On direct appeal, Petitioner did not incorporate his "denigrating mitigation evidence" prosecutorial misconduct challenge with his challenge to the mitigation instruction. *Brief of Appellant* at 46-51, 54-56. Nevertheless, because the OCCA addressed the merits of his prosecutorial challenge, deference is due this determination.

"outweighing" four times in this discourse as he compared Petitioner's mitigating evidence to the aggravating circumstances the State alleged in support of a death sentence. Because it was the jury's job to weigh the aggravating and mitigating circumstances, the Court cannot fault the OCCA for finding this argument within the bounds of reasonable argument. Grissom, 253 P.3d at 992-93 (quoting Warner v. State, 144 P.3d 838, 890-91 (Okla. Crim. App. 2006), for the proposition "that prosecutors have 'the right to discuss evidence during the second stage in arguing for an appropriate punishment . . . [and] may properly attempt to minimize the effect of the evidence presented by the defense.'").

In addition, the Court notes that defense counsel focused his argument on the fact that Petitioner accepted responsibility for his crimes and offered no excuses. However, counsel stated that what the defense did offer were "things that happened in [Petitioner's] life that showed [the jury] what brought him to that house that day and things [the jury] can consider as citizens to decide whether someone lives or dies" (Tr. IX, 17).[16] Counsel then reviewed what had been presented about Petitioner's life before seeking the jury's mercy and begging the jury to spare Petitioner's life (Tr. IX, 22-28).

---

[16] In second stage opening statement, trial counsel also stated that mitigating circumstances are not excuses, but he went on to explain as follows:

> What we intend to offer is things in [Petitioner's] life that tend to mitigate that, that tend to give you reasons to spare his life. As we have discussed in the jury selection process, you may vote for life for any reason in your moral judgment you feel is appropriate, and we will show you those reasons.

(Tr. VII, 46-47).

As did the Tenth Circuit in <u>Hanson</u>, 797 F.3d at 852, this Court finds that "[i]n light of all of the instructions and of the prosecutor's various comments, . . . it [is] hard to imagine that the jurors thought they were prohibited from considering any of the mitigating evidence they heard at [trial]." Relief is therefore denied.

### F.  Ground Six:  The Continuing Threat Aggravator.

In Ground Six, Petitioner challenges the continuing threat aggravator, one of the three aggravating circumstances the jury found in support of his death sentence. On direct appeal, Petitioner challenged the aggravator on two related bases. Petitioner's primary challenge went to the sufficiency of the evidence. His related challenge was that his prior burglary convictions should not have been admitted in support of this aggravator. Consequently, Petitioner argued that his claim of insufficient evidence was even stronger when this allegedly inadmissible evidence was excluded from the OCCA's review. *Brief of Appellant* at 39-46; *Reply Brief of Appellant* at 14-16. In denying Petitioner relief, the OCCA addressed the claim as follows:

> In Proposition Six, [Petitioner] argues that the evidence is insufficient to support the jury's finding of the aggravating circumstance that there exists a probability that defendant will commit criminal acts of violence that will constitute a continuing threat to society. We review this challenge to determine whether the evidence, in the light most favorable to the prosecution, would permit a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt. <u>Jones v. State</u>, 2006 OK CR 10, ¶ 4, 132 P.3d 1, 2; <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781–83, 110 S.Ct. 3092, 3102–04, 111 L.Ed.2d 606 (1990). In <u>Gilson v. State</u>, 2000 OK CR 14, ¶ 157, 8 P.3d 883, 925, this Court held:
>
> > To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. In evaluating whether there is a probability that the

defendant will commit acts of violence which will constitute a continuing threat to society, we have held that evidence of the callousness of the murder for which the defendant was convicted can be considered as supporting evidence, as well as prior criminal history and the facts of the murder for which the defendant was convicted. (internal quotations omitted).

We find sufficient direct and circumstantial evidence to support the jury's finding of the "continuing threat" aggravating circumstance beyond a reasonable doubt. In addition to the facts of the crime itself, which show a callous and pitiless slaying, the State presented evidence of [Petitioner's] prior burglaries, which progressed from auto burglaries to residential break-ins. [Petitioner] told an investigator after his arrest for a residential burglary in Texas that he would have done "whatever it took" if he had been confronted by an occupant of the residence he was burglarizing. This revealed the formation of [Petitioner's] criminal attitude and his willingness to use violence to achieve his objectives. The State also presented evidence that [Petitioner] violently assaulted and threatened his then-wife with a loaded firearm during a domestic dispute. The jury was able to place these facts within the context of other evidence of [Petitioner's] life history, his alcoholism, his unstable home life, unemployment, and depression. We find the evidence of [Petitioner's] prior criminal history was properly admitted for the jury's consideration in connection with this aggravating circumstance, and the jury's finding is supported by sufficient evidence. This proposition is denied.

Grissom, 253 P.3d at 990.

Respondent contends that Petitioner's Ground Six is something entirely different from the claim he raised on direct appeal. Consequently, Respondent argues that Petitioner's Ground Six is unexhausted and should be treated as procedurally barred. Response, pp. 80-82. Although Petitioner asserts that his Ground Six is "a single constitutional challenge to the 'continuing threat' aggravating circumstance[,]" he also acknowledges that it is "a slight shift in the focus of [his direct appeal] theory." Reply, p. 18. The truth is somewhere in between.

To borrow a phrase from habeas counsel, Petitioner's Ground Six is best described as the "kitchen sink approach" to relief. Petition, p. 76. While the Court believes that some of Petitioner's arguments are in fact related to the claim he raised on direct appeal, Petitioner presents various challenges to the constitutionality of the continuing threat aggravator which were not raised on direct appeal. For example, Petitioner asserts that the aggravator is not narrowly construed, that it is broadly applied, and that the jury instruction on the aggravator is insufficient to guide the jury's determination. Petition, pp. 75-77. Although these claims have not been presented to the OCCA and are unexhausted as Respondent contends, it is equally clear that they are easily disposed of pursuant to 28 U.S.C. § 2254(b)(2) due to their lack of merit. Because the Tenth Circuit has repeatedly upheld Oklahoma's continuing threat aggravating circumstance in light of numerous constitutional challenges and because Petitioner has failed to give this Court pause to question this binding circuit authority, Petitioner's constitutional challenges to the aggravator are denied. See Wilson v. Sirmons, 536 F.3d 1064, 1109 (10th Cir. 2008) ("We have repeatedly upheld the constitutionality of this aggravator."); Brown v. Sirmons, 515 F.3d 1072, 1092 (10th Cir. 2008) ("We have repeatedly upheld the constitutionality of this aggravating factor, finding it neither unconstitutionally vague nor overbroad."); Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002) ("Tenth Circuit precedent forecloses [petitioner's] argument that Oklahoma's application of the continuing threat aggravator is unconstitutional."); Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000) ("Our Circuit has repeatedly upheld the facial constitutionality of

[the continuing threat aggravator] as 'narrowed' by the State of Oklahoma, and we are bound by that body of precedent.").

Within his Ground Six, Petitioner also complains about testimony given by George Ferguson. In particular, Petitioner asserts that he was not given proper notice of Mr. Ferguson's testimony and was therefore not given the opportunity to deny or explain Mr. Ferguson's testimony about a damaging statement Petitioner made to him. Although Petitioner asserts that this issue with Mr. Ferguson constitutes a separate constitutional violation, Petition, pp. 74, 78, the Court finds that it was not a part of the insufficiency claim Petitioner raised on direct appeal, that Petitioner has never presented it as an independent claim, and that Petitioner's tangential references to the same within his Ground Six are insufficient to prompt the Court's review in any event.

Turning to the exhausted direct appeal claim, the Court concludes that Petitioner has failed to show that the decision of the OCCA was unreasonable. In reviewing Petitioner's claim, the OCCA applied the standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979), the same standard this Court applies: "whether the evidence, in the light most favorable to the prosecution, would permit a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt." Grissom, 253 P.3d at 990 (citing Jones v. State, 132 P.3d 1, 2 (Okla. Crim. App. 2006), and Lewis v. Jeffers, 497 U.S. 764, 781-83 (1990)). "Like findings of fact, state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Jeffers, 497 U.S. at 782 (quoting Jackson, 443 U.S. at 319). Thus, this Court "'must

accept the jury's determination as long as it is within the bounds of reason.'" Lockett v. Trammel [sic], 711 F.3d 1218, 1243 (10th Cir. 2013) (quoting Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005)). The Jackson standard of review is highly deferential to the jury's verdict, but when a layer of AEDPA deference is added to it, Petitioner's ability to obtain relief is all the more difficult. See Hooks, 689 F.3d at 1166 ("We call this standard of review 'deference squared.'") (citation omitted). When reviewing the evidentiary sufficiency of an aggravating circumstance under Jackson, the Court looks to Oklahoma substantive law to determine its defined application. Hamilton v. Mullin, 436 F.3d 1181, 1194 (10th Cir. 2006).

As set forth in the Special Bill of Particulars, the State alleged the following evidence supported the continuing threat aggravating circumstance:

> All evidence relating to the nature and circumstances of the murder of Amber Matthews which demonstrates the brutal and callous nature of [Petitioner's] actions.

> At the time he brutally murdered Amber Matthews, [Petitioner] had previously been convicted of four felony burglary offenses, which escalated in terms of seriousness of threats to society. After burglarizing a vehicle in Dallas County, Texas on May 9, 1990, on November 5th of the same year he burglarized a vehicle and the garage of a residence in Denton County, Texas. On September 24, 1992, he burglarized a home, entering the back door of a residence during daytime hours in Collin County, Texas, and was sentenced to confinement in prison

> On December 9, 2004, in Logan County, Arkansas, [Petitioner], while still serving the Texas burglary sentence on parole, put a .22 caliber rifle to his wife's head and threatened to kill her. During that incident [Petitioner] fired several shots into the house where he and his wife resided.

(O.R. I, 101-02).

In support of these allegations, the State relied on the evidence regarding the murder itself as presented in the first stage, plus five witnesses presented in the second stage. The first two second stage witnesses were Petitioner's ex-wife, Barbara Grissom (Carlisle), and a law enforcement officer who responded to her 911 call on December 9, 2004. The call concerned Petitioner's threat to kill her with a loaded rifle. Petitioner put the rifle to her head more than once, and although she escaped injury, Petitioner did fire five rounds inside his mobile home dwelling where she was visiting him (Tr. VII, 58-63, 87-97; State's Exhibits 100-108). The third witness was a police officer from Coppell, Texas, who testified concerning Petitioner's participation in a car burglary. This crime occurred in the middle of the night on May 9, 1990 (Tr. VII, 100-07; State's Exhibit 93). The fourth witness was Mr. Ferguson, a former detective for the Flower Mound (Texas) Police Department, who testified about Petitioner's burglary of a residence and a vehicle in the middle of the night on November 5, 1990. When asked by the detective what he would have done if someone had come home, Petitioner told him, "whatever it took" (Tr. VII, 108, 110-17, 120; State's Exhibits 94 and 95). The final witness was a Plano police officer who testified about Petitioner's burglary of a residence during the daytime on September 29, 1992 (Tr. VII, 121-26; State's Exhibit 96).

In an attempt to show the unreasonableness of the OCCA's decision, Petitioner asserts, as he did on direct appeal, that his prior burglary offenses should not have played into the calculus of whether or not he was a continuing threat because they were all non-violent offenses. Petitioner also takes issue with the OCCA's finding that his prior burglaries "progressed from auto burglaries to residential break-ins." Grissom, 253 P.3d

at 990. Although "[u]nder Oklahoma law, a nonviolent crime standing alone cannot be the basis for finding the continuing threat aggravator[,]" <u>Wilson</u>, 536 F.3d at 1110 (citing <u>Torres v. State</u>, 962 P.2d 3, 23 (Okla. Crim. App. 1998)), the Tenth Circuit has acknowledged that "neither Oklahoma nor the United States Supreme Court has ever prohibited a jury from considering the defendant's nonviolent offenses in conjunction with other factors when determining whether the defendant poses a future risk to society." <u>Boltz</u>, 415 F.3d at 1231. In light of this authority, Petitioner simply cannot overcome the great deference afforded to the OCCA's sufficiency determination.

Petitioner's remaining arguments lack merit as well. As to the facts of the murder itself, Petitioner faults the OCCA for considering the same. He argues that while his crime was "certainly cruel," so is every murder. Petition, p. 77. However, the Tenth Circuit has specifically rejected this argument. <u>Sallahdin</u>, 275 F.3d at 1231-32. In <u>Sallahdin</u>, the Tenth Circuit also acknowledged that under Oklahoma law, the continuing threat aggravator "may be based solely on the evidence of the calloused nature of the crime." <u>Id.</u> at 1232. In Petitioner's case, the facts of the murder were just a portion of the evidence the OCCA found to support the jury's finding of the aggravator and, given the facts, this determination was reasonable. Finally, although Petitioner argues that OCCA did not review all of the evidence in making its sufficiency determination, there is no support for that assertion. Petition, pp. 78-79. Just because the OCCA did not reference every piece of evidence in its analysis does not mean that it did not consider it all. Ground Six is denied.

## G.     Ground Seven:     Prosecutorial Misconduct.

Petitioner's seventh ground for relief challenges four comments made by the prosecutor in second stage closing arguments.  Petitioner raised this claim on direct appeal.  Because defense counsel did not object to any of the arguments, see Ground One, supra (challenging counsel's effectiveness for failing to object), the OCCA reviewed the claim for plain error and, finding none, it denied relief.  Grissom, 253 P.3d at 992-93.  Applying AEDPA deference, the Court finds that Petitioner has not established his right to relief on this claim.  See Douglas v. Workman, 560 F.3d 1156, 1171 (10th Cir. 2009) ("[W]hen a state court applies plain error review in disposing of a federal claim, the decision is on the merits to the extent that the state court finds the claim lacks merit under federal law.") (citing Cargle v. Mullin, 317 F.3d 1196, 1206 (10th Cir. 2003)); Thornburg, 422 F.3d at 1124 ("[W]hen a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the applicant as the federal standard, we presume an adjudication on the merits and apply AEDPA deference.").[17]

"Prosecutors are prohibited from violating fundamental principles of fairness, which are basic requirements of Due Process."  Hanson, 797 F.3d at 843.  Therefore, when a petitioner alleges prosecutorial misconduct, the question is whether the

---

[17] In adjudicating Petitioner's claim, the OCCA set forth two standards of review, a general standard for allegations of prosecutorial misconduct, which permits relief "'only where grossly improper and unwarranted argument affects a defendant's rights,'" Grissom, 253 P.3d at 992 (citation omitted), and the standard for plain error review, which affords relief for errors "'going to the foundation of the case or taking from the defendant a right essential to his defense[,]'" id. at 980, 992 (quoting Simpson v. State, 876 P.3d 690, 695 (Okla. Crim. App. 1994)). These standards liken to the due process standard this Court applies, but even if Petitioner's claim was reviewed de novo, Petitioner still would not be entitled to relief for the reasons set forth herein.

prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Evaluating the alleged misconduct in light of the entire proceeding, the reviewing court must determine "whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland, 459 F.3d at 1024.

Petitioner's first complaint is that the prosecutor gave his personal opinion at the very start of his first closing argument when he discussed the path that brought the jury to the point of sentence deliberation and the jury's choice to determine which path to take from there. The prosecutor stated that the jury could "go down the path that [Petitioner] wants" or "choose the other path and give him justice" (Tr. IX, 9). Petitioner argues that these comments inappropriately informed the jury of his opinion that a death sentence was the just sentence. Petition, pp. 80-81. The OCCA denied Petitioner relief on this claim as follows:

> This Court has held similar comments were not plain error where they were "not phrased in personal terms, but appealed to the jury's understanding of justice and asked that standard be upheld." Lockett v. State, 2002 OK CR 30, ¶ 21, 53 P.3d 418, 425, citing Mitchell v. State, 1994 OK CR 70, ¶ 44, 884 P.2d 1186, 1202, and Hammon v. State, 2000 OK CR 7, ¶ 62, 999 P.2d 1082, 1097. We found in Lockett that "the prosecutor basically argued to the jury that justice required the death penalty be imposed under the particular facts of this case, not based upon his personal opinion." Lockett, 2002 OK CR 30, ¶ 21, 53 P.3d at 425. We reach the same conclusion here. The argument was not plain error.

Grissom, 253 P.3d at 992.

Although "[i]t is improper for a prosecutor to inject his personal opinion on the propriety of the death sentence[,] . . . a prosecutor is entitled to argue that under the facts

and law, capital punishment is appropriate." Thornburg, 422 F.3d at 1135. Here, the OCCA's conclusion that the latter occurred is not unreasonable. Immediately following the complained-of comments, the prosecutor directed the jury to Petitioner's first interview wherein Petitioner stated in his "own words" that death was an appropriate sentence for what he did. The prosecutor then stated, "That was his own assessment of what should happen to someone who had done what he just did. He told you what justice was in this case" (Tr. IX, 10). The prosecutor later concluded his first argument with these words: "The punishment should fit the crime and the only punishment that fits in this case is a death sentence" (Tr. IX, 16). Considering the complained-of comments in context, the Court denies relief on this claim.

Petitioner's next complaint relates to his Ground Five and has already been addressed by the Court. Therefore, for the reasons set forth in Ground Five, supra, relief is denied here as well.

With reference to separate comments made in first and second closing, Petitioner asserts that the prosecutor urged the jury to return a death sentence based on sympathy for the victims. In first closing, the prosecutor asked the jury "to remember three images that we presented during the trial because I think they sum up what we have tried to communicate" (Tr. IX, 12). The prosecutor then described the murder scene where the deceased victim and young children were found (the Kopf residence), the hospital where the surviving victim was taken (Watonga Hospital), and the restaurant where Petitioner went to get a beer after the commission of the crimes (Hillstop Cafe), ending with the following comments:

> These three images that I have tried to describe tells us something about the people involved in each of those images. Amber Matthews, an innocent bystander with her whole life ahead of her thinking of the children before herself. Dreu Kopf, a protective mother forever left to wonder if she did the right thing by leaving. Her instinctual decision made in the blink of an eye will undoubtedly leave her questioning for the rest of her life whether she should have been the one to die that day and not Amber. [Petitioner], cold and calloused, not caring about anyone but himself.

(Tr. IX, 14). The OCCA found no error with this argument. In particular, the OCCA stated: "we find the comments are based on the evidence properly admitted at trial and exhorted the jurors to consider particular facts in determining punishment. This is not improper argument." Grissom, 253 P.3d at 993. Again, this determination is not unreasonable. Although sympathy appeals can constitute improper argument, where, as here, the prosecutor's argument was based on the presented evidence, the OCCA's analysis is reasonable. See Wilson, 536 F.3d at 1120 ("The jury should make decisions based on the strength of the evidence, and not on raw emotion, though we recognize that some emotional influence is inevitable.").

In second closing, the prosecutor stated as follows:

> He also asked you to think about how his parents feel on that trip to McAlester. Give you something else to think about. I wonder how it must feel to go to Amber's grave site on her birthday. I wonder how that feels. Knowing she is never coming back. And for why? What reason? No reason at all. How must that feel?

(Tr. IX, 29). As is apparent, this argument related back to something defense counsel had said in his closing remarks. In talking about carrying out a jury's death sentence, defense counsel asked the jury to imagine the execution scene and the "poor people who had this

pitiful son going to that dark little building in McAlester and watch their son die" (Tr. IX,

20). For this reason, the OCCA denied relief.

> We find this comment was in response to defense counsel's argument that
> jurors could celebrate the sanctity of human life by showing mercy to the
> defendant with a non-capital sentence. As the argument was a proper
> response to the defense, there is no plain error.

Grissom, 253 P.3d at 993. The OCCA's analysis of this claim finds support in United

States v. Young, 470 U.S. 1, 12-13 (1985), wherein the Supreme Court acknowledged

that a reviewing court must consider a prosecutor's comments in light of the argument

made by the defense. The Supreme Court stated that "if the prosecutor's remarks were

invited, and did no more than respond substantially in order to right the scale, such

comments would not warrant reversing a conviction." Id. (internal quotation marks

omitted). Accordingly, relief is denied.

Petitioner's final complaint concerns the prosecutor's last words to the jury

regarding the "march toward justice" and the "torch of truth." Petitioner asserts that

these comments gave the jury the false impression that law enforcement, the district

attorney's office, the victims, and the jury were all in this together and that in essence it

was the jury's job to finish the race by returning a just sentence of death. Petition,

pp. 86-87. The prosecutor's comments were as follows:

> Let me leave you with one final thought. I told you in my opening
> statement that once [Petitioner's] murderous rampage was over that another
> mission began. That mission was the steady constant march toward justice.
> The police started that march toward justice over two years ago. They
> marched with this torch of truth without fail until they had captured the
> man that had brutally murdered Amber Matthews. And when their work
> was finished they passed the torch of truth on to the District Attorney's
> Office, to Mr. Rutherford and to me. For the last two years we have stood

arm in arm with the Matthews family and continued that march toward justice, that torch of truth. We have done the very best that we can for as long as we can. We have done the very best we can to bring the truth to this courtroom. The way our system is set up we are not permitted to carry that torch of truth across the line. You as a juror, that is your role. This march toward justice has included our carrying that torch of truth up to the line. And at this point we are handing you all that torch of truth, hoping and trusting that you will carry it across the line where justice awaits. Justice in his case is a death sentence. Thank you.

(Tr. IX, 30-31).

In denying relief, the OCCA held as follows:

This Court said in Sanchez v. State, 2009 OK CR 31, ¶ 75, 223 P.3d 980, 1005, that it "will not require counsel in such serious cases to address the jury with lifeless and timid recitations void of moral reflection or persuasive power." The comments challenged here form only a small part of a lengthy summation in which the State and defense counsel passionately argued conflicting views about the meaning of justice in this case. The jurors were well aware that the statements of counsel were not evidence and were intended to persuade the jury during its deliberations. Under these circumstances we cannot say that the challenged comments here were plain error. Even if individual comments in the State's closing argument were erroneous, we have no grave doubt that erroneous comments had a substantial influence on the outcome at trial.

Grissom, 253 P.3d at 993. Petitioner asserts that the prosecutor's comments were "unbelievably prejudicial." He contends that "[t]he OCCA had to be appalled by it[,]" and yet it nevertheless denied relief. Petition, p. 87.

Although the written record does not always convey the tone of an argument, there is little doubt that the prosecutor's argument here was dramatic and perhaps over the top. However, that is not the standard for relief. The question this Court must answer is whether *all* fairminded jurists would disagree with the OCCA's rationale and denial of relief. Frost, 749 F.3d at 1225 ("Under the test, if all fairminded jurists would agree the

state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied."); Stouffer v. Trammell, 738 F.3d 1205, 1221 (10th Cir. 2013) ("We may reverse only if all fairminded jurists would agree that the state court got it wrong.") (internal quotation marks omitted). The answer is a clear no, and the Court additionally finds that even if the argument were viewed de novo, Petitioner would still not be entitled to relief. In addition to the OCCA's reasoning, the Court finds that the very nature and circumstances of the murder and the evidence supporting three aggravating circumstances (two of which were easily proven) support the conclusion that the prosecutor's argument did not deny Petitioner a fair sentencing proceeding. See Phillips v. Jones, No. CIV-12-0735-HE, 2013 WL 6169295, at *12-13 (W.D. Okla. Nov. 21, 2013) (denying habeas relief for these same comments).

For the foregoing reasons, the Court finds that Petitioner is not entitled to relief based on prosecutorial misconduct. Ground Seven is therefore denied.

### H. Ground Eight: Biased Juror.

In Ground Eight, Petitioner asserts that he was denied his right to an impartial jury due to a juror's failure to reveal during voir dire that he had been arrested and criminally charged on two separate occasions. Petitioner presented this claim to the OCCA on direct appeal. After remanding the case for an evidentiary hearing, the OCCA denied relief. Grissom, 253 P.3d at 975-79. Although the parties agree that the applicable Supreme Court authority is McDonough Power Equipment, Inc., v. Greenwood, 464 U.S.

548 (1984), they disagree over whether the OCCA's decision is entitled to deference. Petition, p. 91; Response, p. 102; Reply, pp. 21-22.  Because it is clear that Petitioner's claim fails even under de novo review, the Court need not settle this dispute in order to adjudicate Petitioner's claim.

As noted above, Petitioner was granted an evidentiary hearing with respect to this claim.  At the hearing, Petitioner presented two witnesses, the juror and one of his trial attorneys.  After the hearing, the OCCA summarized the relevant facts as follows:

> [T]he juror was arrested in 1989 and charged with larceny of merchandise from a retailer, a felony. He entered a plea of guilty to the offense and received a deferral of sentence for one (1) year. After completion of a term of probation, the charge was dismissed. The prospective juror was arrested a second time in 2007 and charged with three misdemeanors, including possession of marijuana, possession of drug paraphernalia, and failure to maintain security verification form. Those charges were subsequently dismissed on the State's motion. [Petitioner] . . . presented testimony from his trial counsel that if he had known of the prospective juror's prior arrests and charges, he would have inquired further to determine the prospective juror's qualifications.

> During the district court's *voir dire* examination,[FN2] the court directly asked each panel of prospective jurors if they had ever been "charged with or accused of a crime?" Several jurors responded affirmatively and gave accounts of their arrests and/or convictions of various crimes. The prospective juror with whom we are concerned here did not respond affirmatively to this question. He also demurred when the court asked if he had any answers he felt the court or attorneys "need to hear." The prosecutor later asked, "is there anyone that had indicated previously that they had a prior contact with law enforcement that I have not spoken with?" Again, the juror did not reveal his prior arrests or charges. When the prosecutor asked prospective jurors if they had "any contact with the District Attorney's office," the juror responded: "I know you from high school so that's another thing. I was going to mention that earlier." The prosecutor acknowledged that he and the prospective juror "played a little football together." The prospective juror then denied there was "anything about the fact that you have known me that would cause you not to be fair and impartial in this case?" The record also reflects that the

prosecutor in this case did not represent the State in either of the criminal cases filed against the prospective juror. The parties passed this prospective juror for cause and he served on the trial jury. In an affidavit and his subsequent testimony at the evidentiary hearing, the juror explained that he believed he did not have to disclose his prior arrests because the charges in both cases were dismissed. He conceded at the evidentiary hearing that his failure to answer these questions affirmatively was not entirely truthful. The juror also denied having any bias for or against the parties, stating that he served as a juror only reluctantly because he felt it was his duty.

> FN2. The district court also used questionnaires to collect information from prospective jurors. The questionnaire only asked if prospective jurors had ever been convicted of a felony. The juror in question truthfully answered "no."

Grissom, 253 P.3d at 975-76. Petitioner does not challenge these particular facts, and therefore, they are presumed correct in this proceeding. 28 U.S.C. § 2254(e)(1).

In denying relief, the OCCA found that although the juror should have disclosed his prior arrests and charges, Petitioner had not shown any resulting prejudice. In particular, the OCCA held in pertinent part that

> the undisclosed information shown here does not support a challenge for cause or show any improper relationship that would "approach a challenge for cause." Allison, 1983 OK CR 169, ¶ 59, 675 P.2d at 153. And we cannot say . . . that "any defense attorney" would peremptorily challenge a prospective juror based solely on knowledge of their prior arrests. Indeed, two other prospective jurors in this case who disclosed their prior arrests— one for disorderly conduct and another for cruelty to animals—were passed for cause and served on the jury. A third prospective juror disclosed that he was on a deferred sentence for a felony. He was also passed for cause, but was not drawn to serve on the final panel. The record contradicts any suggestion that a prospective juror's prior arrest would have led inexorably to a peremptory challenge from the defense.[FN4]

> > FN4. Notwithstanding, trial counsel testified at the evidentiary hearing that in a case such as this, he did not want people with criminal arrests or convictions sitting on the jury, because in his experience people who had lived a moral life were more likely to give a life sentence.

This Court said in <u>Manuel</u> that "it is not error alone that reverses judgments of convictions of crime in this State, but error plus injury, and the burden is upon the appellant to establish to the appellate court the fact that he was prejudiced in his substantial rights by the commission of error." <u>Id.</u>, 1975 OK CR 174, ¶¶ 5–7, 541 P.2d at 236, quoting <u>Thompson v. State</u>, 1974 OK CR 15, ¶ 10, 519 P.2d 538, 541. The Court's opinion in <u>Allison</u> shows that an appellant must do more than simply assert that he would have used a peremptory challenge if he had known then what he knows now. [Petitioner] does not even make that claim here. Trial counsel's testimony at the evidentiary hearing shows that he might have inquired further into the details of the arrests, and would have weighed the prospective juror's prior arrests as a factor in exercising his peremptory challenges.[FN5] Trial counsel also testified at the evidentiary hearing that if he had known of the prospective juror's failure to disclose the prior arrests, he would have challenged the juror for cause. However, even if counsel had discovered during *voir dire* the juror's honest, but mistaken, belief about his obligation to disclose his prior arrests, the juror's error would not have supported a challenge for cause. 22 O.S.2001, §§ 659, 660 (challenge for cause must show either implied bias defined by statute, or express bias, i.e., a state of mind showing that prospective juror cannot try the case impartially).

FN5. Despite his testimony at the evidentiary hearing that prior arrests and criminal charges were paramount among his concerns for prospective jurors in this case, the State points out that defense counsel did not ask a single question of a prospective juror concerning a prior arrest or criminal charge.

[Petitioner's] claim falls short of demonstrating any actual injury from the juror's non-disclosure. The juror was previously arrested and charged with crimes on two occasions: this is the sum of his nondisclosure. The charges arising from those arrests were dismissed. The juror testified at the evidentiary hearing that he honestly believed (incorrectly, it turns out) that he was not required to disclose his prior arrests. He had no knowledge of the facts of the case; no undisclosed relationship to the material witnesses or the parties. The juror testified on *voir dire* that he had gone to high school and played football with the lead prosecutor in this case, and knew one of the witnesses casually, which apparently raised no concerns for the defense about his impartiality.

At the evidentiary hearing, the juror testified that he was working as a partially commissioned salesperson at the time of the trial, had two children, and his wife was eight and a half months pregnant. He testified that he was reluctant but willing to do his duty as a juror and did not try to

excuse himself from jury duty because of his job or family circumstances. He denied having any intention to mislead the court or counsel. These circumstances dispel the inference, so imaginatively urged by [Petitioner], that this juror corruptly concealed the truth about his arrests to get himself seated on this jury. While we do not condone the juror's non-disclosure, we find that [Petitioner] suffered no prejudice from it. No relief is warranted under the controlling authorities.

Grissom, 253 P.3d at 978-79.

In order to obtain relief under McDonough, Petitioner must make two showings. He "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough, 464 U.S. at 556. As the Tenth Circuit has acknowledged, "[a] party cannot satisfy the first part of this test merely by demonstrating a juror provided a 'mistaken, though honest, response to a question.'" Gonzales v. Thomas, 99 F.3d 978, 984 (10th Cir. 1996) (quoting McDonough, 464 U.S. at 555). Here, the OCCA specifically found that the juror was "honest, but mistaken[.]" Grissom, 253 P.3d at 979. Although Petitioner takes issue with this finding, the Court concludes that Petitioner's arguments do not show by clear and convincing evidence that this finding is incorrect.

Petitioner asserts that the OCCA was not in the best position to assess the juror's credibility. Faulting the OCCA for not ordering the trial court to make findings of fact, he claims that the OCCA's assessment of the juror's credibility from the "cold record" is unreasonable. Petition, p. 93; Reply, p. 22. Having reviewed the evidentiary hearing transcript, the Court finds that the OCCA's determination was reasonable. The fact that the finding was made by the OCCA as opposed to the trial court is of no consequence

because there is absolutely no question about what occurred in this case. The juror was arrested and charged, but because both times the charges were ultimately dismissed, the juror believed that they were not a part of his record and were as if they never happened (Tr. 5/17/10, 6, 15-19, 30, 32). Therefore, it was not unreasonable for the OCCA to find that the juror was honest but mistaken, and because McDonough "is directed at intentionally incorrect responses," Gonzales, 99 F.3d at 984, Petitioner has not shown his entitlement to McDonough relief.

In addition to failing to meet the first part of the McDonough test, Petitioner fails the second part as well. Even if the juror had disclosed his prior arrests and charges during voir dire, Petitioner has not shown that the juror would have been subject to a valid challenge for cause. Petitioner makes no specific allegations of either implied or actual bias. At most, Petitioner asserts that bias can be assumed because the juror lied. However, this is not enough to meet the McDonough test. United States v. McConnel, 464 F.3d 1152, 1157 (10th Cir. 2006) ("We have previously noted that to hold that bias can be inferred solely from a dishonest response during *voir dire* would in effect do away with the second prong of McDonough.") (citing Skaggs v. Otis Elevator Co., 164 F.3d 511, 517 (10th Cir. 1998)).

Having found that Petitioner cannot satisfy either part of the McDonough test, even under de novo review, the Court denies Petitioner relief on his Ground Eight.

## I.     Ground Nine:       Trooper Lucero's Testimony/Actions.

Petitioner's Ground Nine focuses on the testimony and actions of a State witness, Oklahoma Highway Patrolman Anthony Lucero. Petitioner asserts that his testimony was

so emotional as to be prejudicial and that his actions upon exiting the courtroom were prejudicial as well. Petitioner raised this claim in post-conviction. The OCCA procedurally barred the claim because it could have been raised on direct appeal. The OCCA also found that appellate counsel was not ineffective for failing to raise the claim on direct appeal. Grissom, No. PCD-2008-928, slip op. at 7-10.

In response to Respondent's assertion that this Court should apply a procedural bar to this claim, Petitioner makes two arguments. First, referring to his Procedural Default Statement, Petitioner argues that the procedural bar is neither adequate nor independent. Petition, pp. 99-100; Reply, p. 23. This argument, however, has already been addressed and rejected in Ground One, supra. Second, Petitioner argues that he has cause for his procedural default of the claim, namely, the ineffectiveness of his appellate counsel. Reply, p. 23. The OCCA evaluated Petitioner's stated cause under Strickland, finding "[a]ppellate counsel's failure to raise this issue was not deficient performance and did not prejudice the outcome of the direct appeal." Grissom, No. PCD-2008-928, slip op. at 10. This finding is entitled to AEDPA deference. Ryder, 810 F.3d at 746; Turrentine, 390 F.3d at 1202.

In an attempt to show that the OCCA's analysis of appellate counsel's effectiveness was unreasonable, Petitioner advances several arguments. First, Petitioner asserts that the OCCA found Trooper Lucero's testimony and actions to be error. There is no support for this assertion. As Respondent has pointed out, Petitioner's argument is based on an inaccurately referenced sentence contained in the OCCA's opinion. Response, p. 109. In addressing the omitted claim, the OCCA never found that it was

actual error.  Grissom, No. PCD-2008-928, slip op. at 7, 9, 10 (referring to the argument Petitioner presented in his second proposition and what he alleged to be objectionable behavior/misconduct/prejudicial error).

Petitioner also argues that the OCCA mischaracterized the record.  Here, Petitioner contends that "[t]he OCCA's vanilla description of what Lucero actually said is starkly different from what was actually said."  Petition, p. 94.  See also Reply, p. 23 ("The OCCA provided a washed out description of Trooper Lucero and what he said and did.").  The OCCA's summary of the record was as follows:

> In his trial testimony, the trooper described the report of the shooting, his arrival at the crime scene, and the ensuing tactical approach to the home. He described hearing a young child screaming inside the home and making the decision to enter the home, confront a possible shooter or shooters, and try to save the survivors. The trooper also testified that upon entering the bedroom where Amber Matthews was shot, he could "smell death in the air," which he associated "with death by pulling people out of car crashes that has got open wounds and usually it's the odor of an open head wound." The trooper also described his shock upon entering the room.

>> I seen a young lady laying on the floor there (indicating). Looked like a head wound. A little girl was standing up in the crib. I mean, going crazy in the crib, this little girl was basically screaming for her [ ] life. There was a baby, a newborn. I thought the newborn had been shot because its whole face was covered in blood and it wasn't moving. The young lady that was on the floor, her eyes were partially open and she was laboring to breathe. I could not believe that somebody would shoot a woman and child, that was my feeling when I first saw that image.

> Counsel objected to this testimony and moved for a mistrial, which the district court overruled. Counsel later moved for a mistrial at the conclusion of the trooper's testimony, stating that he "saw the trooper stare over at [Petitioner] as he was leaving the courtroom," and that "his embellishments, his emotional displays also had the effect of getting the entire crowd in the back of the courtroom, the families of both victims

worked up." The State disputed this characterization, but agreed that the trooper had taken pauses in his trial testimony, apparently because of his emotions surrounding what he had seen.

The following day, the trial court held an evidentiary hearing on Petitioner's motion for a mistrial, at which defense counsel presented testimony from an Indigent Defense System attorney and three of [Petitioner's] cousins, stating either that they had seen the trooper "glare" at [Petitioner] after his testimony, or other objectionable behavior, such as the trooper shaking hands with the victims as he was leaving court. The trial court overruled the motion for mistrial based upon these allegations.

Grissom, No. PCD-2008-928, slip op. at 7-9. The Court finds that this is a reasonable summation of the record, and Petitioner's argument that it should have somehow been more vivid lacks merit.

Next, Petitioner asserts that the OCCA did not address his entire claim. Petition, p. 94; Reply, p. 24. However, as set forth above, it is clear that the OCCA understood the claim being made, one based on both Trooper Lucero's testimony and his actions, and nothing in the OCCA's opinion indicates that it did not address it in full.

Petitioner's final challenge is to the OCCA's Strickland analysis and its failure to grant him an evidentiary hearing on the issue of strategy. In his petition, he faults the OCCA for incorrectly assuming that "guilt findings foreclose[] penalty phase prejudice[,]" and in his reply, he argues that the OCCA "wrongfully assum[ed] . . . that guilt of the aggravating factor forecloses penalty phase prejudice." Petition, p. 94; Reply, p. 24. In concluding that Petitioner was not denied the effective assistance of appellate counsel with respect to Trooper Lucero, the OCCA held as follows:

Again, we review appellate counsel's omission according to the two-part test of Strickland. In this context, we consider the merits of the omitted claim of evidentiary error in the context of the entire trial, and with other

claims raised on direct appeal, to determine whether the omission violated prevailing professional norms and prejudiced the outcome of the direct appeal. If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance.

We first determine that the record does not support Petitioner's argument that this evidentiary error contributed to an unfair outcome either in the first or second stages of trial. The trooper's testimony was probative of his observations at the scene and why he took the actions that he did. As Petitioner conceded guilt of all charges in the first stage of trial, the witness's alleged misconduct thus could not have contributed to the guilty verdict on the charge of murder.

We further find that omission of this claim on direct appeal may have been part of a reasonable strategic decision by appellate counsel to focus on issues having greater potential for relief on direct appeal. Viewed in context of the trial record, this isolated instance of allegedly prejudicial error in the first stage was eclipsed by Petitioner's concession of his guilt of capital murder and the strong evidence of aggravating circumstances. These aggravating circumstances, and the relatively weak evidence of mitigation that counterbalanced them, explain the jury's decision to impose the sentence of death. Appellate counsel's failure to raise this issue was not deficient performance and did not prejudice the outcome of the direct appeal.

Grissom, No. PCD-2008-928, slip op. at 9-10 (citations omitted). The Court finds no fault with the OCCA's analysis, especially given the double deference afforded it by the AEDPA. Jackson v. Warrior, 805 F.3d 940, 954 (10th Cir. 2015) ("Given that the standards of review under both Strickland and AEDPA are 'highly deferential,' habeas review of ineffective assistance claims is 'doubly so.'") (quoting Richter, 562 U.S. at 105). As for the OCCA's denial of an evidentiary hearing, it was not necessary for the OCCA to hold an evidentiary hearing in order to adjudicate this claim. Petitioner's attempt to show otherwise by an affidavit from appellate counsel which was not even in existence when the OCCA issued its ruling is of no avail. Pinholster, 563 U.S. at 181.

For the foregoing reasons, the Court concludes that Petitioner's Ground Nine is procedurally barred. Relief is therefore denied.

### J.   Ground Ten:   Modification of Petitioner's Larceny Conviction.

In Ground Ten, Petitioner claims that the OCCA violated his federal constitutional rights to due process and a fair trial by modifying his larceny conviction from grand larceny to larceny of a motor vehicle. See Grissom, 253 P.3d at 987-89. In support of his request for relief, Petitioner cites Apprendi v. New Jersey, 530 U.S. 466, 477 (2000), and In re Winship, 397 U.S. 358, 364 (1970), and argues that the OCCA erred when it simply modified his conviction as opposed to remanding the case for retrial on the appropriate charge. Petition, pp. 95-97. Respondent asserts that the claim Petitioner presents in his tenth ground for relief is not the claim he raised on direct appeal. Consequently, Respondent argues that the claim is unexhausted and subject to an anticipatory procedural bar. Response, pp. 112-15.

Petitioner bears the burden of proving that he has exhausted this claim in state court. Selsor v. Workman, 644 F.3d 984, 1026 (10th Cir. 2011); McCormick v. Kline, 572 F.3d 841, 851 (10th Cir. 2009); Hernandez v. Starbuck, 69 F.3d 1089, 1092 (10th Cir. 1995). In addition, because Respondent has also argued for the application of a procedural bar, Petitioner has the burden of responding to this affirmative defense. Hooks, 184 F.3d at 1217 ("Once the state pleads the affirmative defense of an independent and adequate state procedural bar, the burden to place that defense in issue shifts to the petitioner. This must be done, at a minimum, by specific allegations by the petitioner as to the inadequacy of the state procedure."). This he has not done. Although

Respondent has raised the issue of exhaustion and argued that this claim would be procedurally barred if Petitioner were to return to the OCCA to present it in a second post-conviction application, Petitioner's reply contains no response to these assertions. For these reasons, the Court finds that Petitioner's Ground Ten is procedurally barred.

### K.      Ground Eleven:      Cumulative Error.

In his final ground for relief, Petitioner argues that he is entitled to relief on the theory of cumulative error.  However, as Respondent has pointed out, cumulative error relief is only available where two or more *constitutional* violations have been found. Jackson, 805 F.3d at 955; Hancock v. Trammell, 798 F.3d 1002, 1006-07 (10th Cir. 2015); Williams, 782 F.3d at 1218; Cole v. Trammell, 755 F.3d 1142, 1177 (10th Cir. 2014).  On direct appeal, the OCCA found three state law errors, Grissom, 253 P.3d at 996, and in post-conviction, the OCCA found "no cumulative impact of errors in the trial proceedings that renders Petitioner's death sentence unreliable[,]" Grissom, No. PCD-2008-928, slip op. at 13.  Because neither the OCCA nor this Court has found any constitutional errors, Petitioner has no basis with which to support a claim for cumulative error.  Ground Eleven is denied.

## V.  Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery as well as a motion for an evidentiary hearing.  Docs. 21 and 47.  For the following reasons, the Court finds that both should be denied.

In order to conduct discovery, Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires Petitioner to show good cause.  In

Bracy v. Gramley, 520 U.S. 899, 908-09 (1997), the Supreme Court acknowledged that "good cause" requires a pleading of specific allegations showing a petitioner's entitlement to relief if the facts are fully developed.

In support of his request to conduct discovery, Petitioner argues that because there have been some instances in which Oklahoma prosecutors have failed to comply with their obligations under Brady v. Maryland, 373 U.S. 83 (1963), and Napue v. Illinois, 360 U.S. 264 (1959), it is possible that they did so in his case as well. Petitioner acknowledges that his habeas counsel was permitted to "review portions" of the prosecution's files; however, he claims that this review left questions regarding the absence of material he believed the prosecution should have had. In particular, Petitioner notes the absence of the following items: (1) interviews or notes regarding his ex-wife, Barbara Grissom (Carlisle); (2) documentation regarding his statement to George Ferguson; (3) interviews or notes regarding Trooper Anthony Lucero; and (4) information regarding his intoxication. Petitioner's discovery request includes six requests for production and three interrogatories related to these matters. Doc. 21.

Regarding his "unstable" ex-wife, Petitioner characterizes her testimony at trial as "[s]urprising and inconsistent." With reference to an affidavit obtained from her some two years after trial, Petitioner's argument here appears to be that he was surprised when she said nice things about him and had information about his life in prison. Doc. 21 at 4 & n.5. Ms. Grissom testified on behalf of the State in the second stage regarding a domestic violence incident in which Petitioner threatened to kill her. See Ground Six, supra. Although called as a State's witness, the record reflects that Ms. Grissom had also

been included on Petitioner's witness list as a second stage witness to testify, among other things, "that she loves and cares for [Petitioner] and that his life has meaning to her" (O.R. III, 329). On cross-examination, trial counsel questioned Ms. Grissom about how Petitioner treated her. In response, she testified that Petitioner was kind to her when he was sober and that the ladies at the nail salon were jealous of her because Petitioner gave her gifts and did things for her that their husbands did not do. She further testified that she and Petitioner "probably would have been together today if it wasn't for his mother" (Tr. VII, 82-83). Under these circumstances, it is clear that Petitioner was not surprised by Ms. Grissom's kind words. In addition, given that Ms. Grissom's knowledge of Petitioner's life in prison came from Petitioner himself, he has no argument that the State kept this information from him.

Mr. Ferguson, a former detective for the Flower Mound (Texas) Police Department, testified about Petitioner's burglary of a residence and a vehicle in the middle of the night on November 5, 1990. When asked by the detective what he would have done if someone had come home, Petitioner told him, "whatever it took" (Tr. VII, 116-17). See Ground Six, supra. Because this statement was not contained in the detective's report, Petitioner contends that it resulted in "[u]nfair surprise and prejudice." Doc. 21 at 4. On cross-examination, trial counsel brought out the fact that the statement was not a part of Mr. Ferguson's report. When he asked Mr. Ferguson to explain why, Mr. Ferguson testified that it was not included because "it wasn't pertinent." Trial counsel questioned Mr. Ferguson's memory of the statement, given that it was not in his report and that it was made over eighteen years before, and in an obvious effort to

86

show the contradiction, trial counsel pointed out that Mr. Ferguson's report did reference Petitioner's additional statement that when the garage door went up, he ran off because he was scared (Tr. VII, 117-19). Although counsel may have been surprised by the testimony, this record reflects that he challenged it appropriately. Petitioner has not shown that discovery is needed to pursue this matter further. Not only is it unclear as to what Petitioner is looking for, but how the same would entitle him to relief.

Regarding Trooper Lucero, Petitioner appears to argue that the prosecution's file should have contained some hint as to how the trooper would have testified and acted in court. Doc. 21 at 4-5. <u>See</u> Ground Nine, <u>supra</u>. This is completely baseless.

Petitioner's final assertion is that something is awry because there was nothing in the prosecution's file supporting his claim that he was "highly intoxicated at the time of the crimes." The implication Petitioner makes is that all of the law enforcement officers who were involved – and there were many from different law enforcement entities – colluded to intentionally exclude this information from their reports. Doc. 21 at 5. The record shows that the prosecution provided Petitioner with extensive discovery, including numerous law enforcement reports and copies (both audio and video) of his statement given after his arrest and on the same day the crimes were committed (O.R. I, 47-48, 79, 85; O.R. II, 209-10, 268-69, 280-83; O.R. III, 316-17, 424-27; O.R. IV, 502-04, 512, 578). Petitioner has made no allegation that any reports were withheld, and if in fact these reports failed to make any reference to Petitioner's alleged state of intoxication, the Court finds that trial counsel was free to question the officers at trial about this alleged anomaly and to reference Petitioner's statement in support of the same. Having failed to

show good cause for this discovery request, as well as the others, Petitioner's motion for discovery is hereby denied in its entirety.

As for an evidentiary hearing, Petitioner requests that he be granted one in relation to his Grounds One through Four. However, the majority of the claims raised therein have been denied by the Court on the merits because Petitioner has failed to show that the OCCA rendered unreasonable determinations of law or fact under Section 2254(d). In adjudicating these claims, the Court has noted that in accordance with Pinholster, 563 U.S. at 163, its review is limited to the record that was before the OCCA at the time it rendered its decision. Having failed to satisfy Section 2254(d), Petitioner is not entitled to an evidentiary hearing on these claims. Jones v. Warrior, 805 F.3d 1213, 1222 (10th Cir. 2015). As for the remaining claims, the Court has found them to be procedurally barred. Whether or not a claim is procedurally barred is a legal determination for which an evidentiary hearing is unnecessary. See McCleskey v. Zant, 499 U.S. 467, 494 (1991) ("The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard."). For these reasons, Petitioner is denied an evidentiary hearing as well.

## VI. Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's petition (Doc. 20), motion for discovery (Doc. 21), and

motion for an evidentiary hearing (Doc. 47) are hereby DENIED.  A judgment will enter accordingly.

IT IS SO ORDERED this 3rd day of August, 2016.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE